463 F.2d 256
 149 U.S.App.D.C. 310, 93 P.U.R.3d 180
 MOBIL OIL CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Panhandle Eastern Pipe
Line Company et al., Intervenors.
J. M. HUBER CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Philadelphia Gas Works
Division of UGI Corporation, Shell Oil Company,
Intervenors.
WESTERN NATURAL GAS COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Philadelphia Gas Works
Division of UGI Corporation, Carl F. Matzen, et
al., Intervenors.
AMOCO PRODUCTION COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Philadelphia Gas Works
Division of UGI Corporation, Carl F. Matzen, et
al., Intervenors.
The LAND AND ROYALTY OWNERS OF LOUISIANA, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent. Mobil Oil Corporation,
Philadelphia Gas Works Division of UGI
Corporation, Intervenors.
Carl F. MATZEN et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Mobil Oil Corporation
et al., Intervenors.
William Harvey DENMAN et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Cities Service Oil
Company et al., Intervenors.
 Nos. 23463, 23491, 23511, 23633, 23654, 24051, 24180.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued March 4, 1971.
Decided Dec. 17, 1971.
Certiorari Denied June 7, 1972.
 See 92 S.Ct. 2409, 2410, 2413.
Rehearing Granted in Part in No. 23491 Aug. 29, 1972.
 
 Mr. Carroll L. Gilliam, Washington, D. C., with whom Messrs. Philip R. Ehrenkranz, Washington, D. C., and William H. Emerson, Tulsa, Okl., were on the brief, for petitioners in Nos. 23,463, 23,511 and 23,633; also argued for intervenor Cities Service Oil Company in Nos. 23,463, 24,051 and 24,180. Mr. William J. Grove, Washington, D. C., entered an appearance for petitioner in No. 23,633.
 Mr. Sherman S. Poland, Washington, D. C., with whom Messrs. James B. Reed, Houston, Tex., and Daniel F. Collins, Washington, D. C., were on the brief for petitioner in No. 23,491 and intervenor J. M. Huber Corporation in No. 24,180.
 Mr. Dale M. Stucky, Wichita, Kan., for petitioners in No. 24,051 and intervenors Carl F. Matzen, et al., in Nos. 23,463, 23,511 and 23,633.
 Mr. H. H. Hillyer, Jr., New Orleans, La., for petitioner in No. 23,654.
 Mr. Cecil E. Munn, Fort Worth, Tex., for petitioners in No. 24,180.
 Mr. Israel Convisser, Attorney, Federal Power Commission, with whom Messrs. Gordon Gooch, General Counsel, Leo E. Forquer, Assistant General Counsel, Federal Power Commission, and Peter H. Schiff, Solicitor, Federal Power Commission at the time the brief was filed, were on the brief, for respondent.
 
 
 1
 Mr. Dan A. Bruce, Houston, Tex., with whom Mr. Thomas G. Johnson, New York City, was on the brief, for intervenor Shell Oil Company in Nos. 23,491, 24,051 and 24,180.
 
 
 2
 Mr. Graydon D. Luthey, Tulsa, Okl., was on the brief for intervenor Cities Service Oil Company in Nos. 23,463, 24,051 and 24,180.
 
 
 3
 Mr. Charles E. McGee, Washington, D. C., was on the brief for intervenor Atlantic Richfield Company in No. 24,051. Mr. John T. Ketcham, Washington, D. C., also entered an appearance for intervenor Atlantic Richfield Company in No. 24,051.
 
 
 4
 Mr. James J. Flood, Jr., Houston, Tex., entered an appearance for intervenor Panhandle Eastern Oil Company in Nos. 23,463, 24,051 and 24,180.
 
 
 5
 Before LEVENTHAL, ROBINSON and MacKINNON, Circuit Judges.
 
 LEVENTHAL, Circuit Judge:
 
 6
 These are petitions for review of an order of the Federal Power Commission (FPC), accompanied by its opinion No. 562, 42 FPC 164, which determined and declared that the royalty provisions of oil and gas leases constitute sales of natural gas for resale in interstate commerce subject to the Natural Gas Act, and that the landowners are subject to regulation as natural gas companies whose sales are covered by the filings of their lessees, the producer-operators. We reverse.
 
 Facts and Prior Proceedings
 
 7
 In J. M. Huber Corp. v. Denman, 367 F.2d 104 (5th Cir. 1966), the court agreed with landowners that the particular oil and gas leases they executed required the gas-producer lessees to make royalty payments based on the current "market price" of the gas and not, as lessees contended, on the actual price received by the producer for the gas.
 
 
 8
 The market price was not determined because the lessor's claim, for a royalty based on a market price of 23cents per mcf for gas run since 1946, presented "a serious question whether a Court, state or federal, either initially or ultimately, may allow any amounts fixed by jury, court, or both as increased royalty payments without express prior approval of the Federal Power Commission if, as would these, the price thus fixed would exceed levels prescribed by the FPC." (367 F.2d at 110, 111.) The court took account of the public interest issues involved, and directed a reference by the parties to the FPC under the doctrine of primary jurisdiction for that agency to make an initial determination of its jurisdiction over rates to be paid for gas royalty.
 
 
 9
 Thereafter the royalty owner-land-holders in Huber petitioned the FPC for a declaratory order disclaiming jurisdiction over royalty payments. Several lessee-producers involved in similar litigation filed complaints seeking an FPC determination that such royalties are subject to FPC jurisdiction. The FPC consolidated the dockets for hearing and decision. After prehearing conferences and evidentiary hearings, the presiding examiner concluded that the royalty owners are "natural gas companies as defined in the Natural Gas Act"[1] and that a royalty owner seeking an increase in royalty payment must apply to the FPC beforehand. The Commission affirmed in part by a vote of 3-2. It declared that "the royalty provisions of oil and gas leases constitute sales of natural gas for resale in interstate commerce subject to all the provisions of the Natural Gas Act."[2] However, it held that the royalty owners need not make a separate filing to the FPC; the producers' filings were held to cover the royalty "sales" adequately for regulatory purposes.[3]
 
 
 10
 Petitions to review have been filed both by Mobil Oil Corporation and other producers, and by royalty owners, and the cases have been consolidated. The royalty owners challenge the FPC's jurisdictional decision. The producers challenge the contemporaneous ruling, referred to in more detail hereafter, that the royalty owners are entitled to payment on the basis of their contract terms even when higher than the producer's effective rate, provided no breach of ceiling prices is wrought. We find error in the jurisdictional determination.
 
 
 11
 Ruling That The FPC Does Not Have Jurisdiction Over The
 
 
 12
 Payment of Royalties Under A Typical Natural Gas
 
 Lease
 
 13
 In the FPC's order of June 23, 1967, setting a hearing on whether royalty payments to the lessors are subject to its jurisdiction, the Commission authorized receipt of evidence relating to general industry contracting practices with respect to gas leases so as to be more fully informed as to the general background of the problem and possible economic and legal consequences before making its determination.
 
 
 14
 Evidence was introduced on industry practice with respect to oil and gas lease agreements. The evidence is well summarized in the opinion of the Presiding Examiner. He focused on the development wherein the landowner has sometimes reserved a royalty of a percentage of the physical hydrocarbon recovered (for oil), has sometimes reserved a royalty of a percentage of the proceeds thereof, and has sometimes reserved a royalty of a percentage of the "market value" thereof at the well or in the field. This portion of the Examiner's opinion provides useful background information and is set forth in an Appendix to this opinion.
 
 
 15
 The Commission found one "basic fact" determinative of the jurisdictional issue: "the effective retention by the royalty holders of a percentage interest in the gas sold in interstate commerce." This led to the conclusion "that if he has contracted to retain an economic interest in interstate sales, he has joined the other interest owners in such sales and he has become a seller of natural gas and therefore a natural gas company."[4]
 
 
 16
 For jurisdiction to attach under the Natural Gas Act, the royalty owners must be held engaged in a "sale in interstate commerce of natural gas for resale." Section 2(6) of the Act defines a "natural gas company" to mean "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."[5] Section 1(b) of the Act provides, 15 U.S.C. Sec. 717(b):
 
 
 17
 "The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."
 
 
 18
 Whether landowners or other royalty owners are engaged in the "sale" of natural gas in interstate commerce for resale within the meaning of Sec. 1(b) of the Act must be determined by reference to the intention of Congress.
 
 
 19
 The Act was passed in 1938 and it has not heretofore been construed to apply to ordinary lessors. While inaction is not controlling on intent, the widespread assumption and acquiescence therein, including administrative and legislative acquiescence, extending over such a great period of time is not lightly to be brushed aside.
 
 
 20
 The intention of Congress cannot be conclusively determined by reference to concepts and classifications under state law decisions normally disposing of "private" controversies. United Gas Improvement Co. v. Continental Oil Co., [the Rayne Field case] 381 U.S. 392, 400, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965).[6]
 
 
 21
 It must ultimately be ascertained in the light of regulatory purpose and objective. But as a point of departure we may properly begin with the presumption that Congress, like other legislatures, has in mind the ordinary, usual, and natural sense of a word like "sale."[7] This canon is given reinforcement for this term because "sale" was not one of the terms for which Congress provided an express or supplemental definition in Sec. 2 ("Definitions") of the Natural Gas Act.[8]
 
 
 22
 We have no need to pursue the intricacies of oil-and-gas law, or to take note of the way in which state law concepts vary in describing the interests created by oil and gas leases.[9] It suffices for this case that generally the royalty owner is not considered, either in common parlance or in conceptions of state law decisions, to be engaged in any "sale" of gas.[10] As to state law we refer to Judge Brown's discussion in Huber.[11] The lease terms give the lessee all possessory interests in gas produced during the life of the lease, including full right of sale.
 
 
 23
 The general understanding of lack of any "sale" by the royalty owner, an understanding rooted in state law concepts, is underscored by the opinion in Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932) decided only a few years before passage of the Natural Gas Act. While that opinion interprets a tax statute, there is pertinence in Justice Stone's discussion of the lack of incidents of a "sale" by the royalty owner, both in technical terms and common understanding. See 287 U.S. at 107, 53 S. Ct. at 75:
 
 
 24
 [T]he statute speaks of a "sale," and these leases would not generally be described as a "sale" of the mineral content of the soil, using the term either in its technical sense or as it is commonly understood. Nor would the payments made by lessee to lessor generally be denominated the purchase price of the oil and gas. By virtue of the lease, the lessee acquires the privilege of exploiting the land for the production of oil and gas for a prescribed period; he may explore, drill, and produce oil and gas, if found. Such operations with respect to a mine have been said to resemble a manufacturing business carried on by the use of the soil, to which the passing of title of the minerals is but an incident, rather than a sale of the land or of any interest in it or in its mineral content. Stratton's Independence v. Howbert, 231 U.S. 399, 414, 415 [34 S.Ct. 136, 58 L.Ed. 285]; see Von Baumbach v. Sargent Land Co., 242 U.S. 503, 521 [37 S.Ct. 201, 61 L.Ed. 460].[12]
 
 
 25
 The Court referred to its rule of longstanding, that "payments by lessees to lessors under mining leases were not a conversion of capital, as upon a sale of capital assets, but were income to the lessor, like payments of rent." Id. at 108, 53 S.Ct. at 76.
 
 
 26
 The FPC's opinion stated "it would be senseless to attempt to determine what is a natural gas company and what is a sale on the basis of Hornbook definitions or local decisions not applicable to the Natural Gas Act. . . . For purposes of the Act, a 'natural gas company' is engaged in 'the sale in interstate commerce of [natural] gas for resale' but whether his operations would be classified as a 'sale' under private law is not determinative, U.G.I. v. Continental Oil Co., 381 U.S. 392 [85 S.Ct. 1517, 14 L.Ed.2d 466]." (R. 5041).
 
 
 27
 In UGI v. Continental Oil Co., supra, referred to as the Rayne Field case, the Supreme Court extended FPC jurisdiction over sales of certain leases, although the Act addresses itself, in terms, to sales of gas. Sound analysis of that case requires development of its background.
 
 
 28
 In Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), the Court held that FPC had jurisdiction over "well-head" sales of natural gas by independent producers to interstate pipeline companies for resale in interstate commerce. As the Phillips opinion made clear (347 U.S. at 677, 74 S.Ct. at 796) the producers admitted "as they must" that they were engaged in "the sale in interstate commerce of natural gas for resale" and hence came within the basic coverage of Sec. 1(b). The issue was whether the sales of an independent producer were excluded from regulation by the ultimate, and negative, clause of Sec. 1(b) excluding "the 'production or gathering of natural gas."' The Court rejected the contention of exclusion, in view of the Act's text and legislative history, including notably the Federal effort to plug the "gap" in regulation of the natural gas industry created by decisions prohibiting state regulation of interstate commerce aspects. The Court found "a congressional intent to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company."[13]
 
 
 29
 In Rayne Field, an interstate pipeline company made arrangements to buy the producers' leasehold interests in the lands in which the natural gas was located, instead of buying the gas produced directly. The gas reserves in Rayne Field were proven and the field was substantially developed. The Court noted "The provisions of the lease-sale agreements were such that they were very close in economic effect to conventional sales of natural gas." (381 U.S. at 396, 85 S.Ct. at 1520). The Court concluded (p. 401, 85 S.Ct. at 1522):
 
 
 30
 "The sales of leases here involved were, in most respects, equivalent to conventional sales of natural gas which unquestionably would be subject to Commission jurisdiction under Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672. [74 S.Ct. 794, 98 L.Ed. 1035] . . . [I]t is perfectly clear that the sales of these leases in Rayne Field, a proven and substantially developed field, accomplished the transfer of large amounts of natural gas to an interstate pipeline company for resale in other States. That is the significant and determinative economic fact. To ignore it would substantially undercut Phillips. . . ."[14]
 
 
 31
 It is in this context, of a transaction that was in form a lease of reserves but in economic impact the equivalent of "conventional sales of natural gas" that the Court, in upholding FPC jurisdiction to avoid "gaps" in the regulatory framework, stated (381 U.S. at 400, 85 S.Ct. at 1522):
 
 
 32
 "A regulatory statute such as the Natural Gas Act would be hamstrung if it were tied down to technical concepts of local law." Rayne Field, supra, 381 U.S. at 400, 85 S.Ct. at 1522.
 
 
 33
 These opinions were written with full awareness of the significance, in commercial and regulatory terms, of the sales of gas by independent producers to interstate pipeline companies. In establishing a Congressional intent to regulate those sales the Court began, in Phillips with what were plainly and admittedly "sales in interstate commerce of natural gas." This was fortified when Rayne Field extended coverage to producers' sale of their leases to interstate pipelines, for that extension was on the ground that these lease transfers were the equivalent "in economic effect to the concept of conventional sales" and such conclusion was required so as not to open gaps in Federal regulation. In both cases the Court did not undercut, it rather underlined, the need for a jurisdictional foundation in "sales in interstate commerce"--plain and admitted in Phillips, and existing through economic equivalent in Rayne Field.
 
 
 34
 When we come to an ordinary lease by the landowner to the producer there is neither a "customary" sale in interstate commerce nor its equivalent in economic effect. Such a lease is a transaction that is itself customary and conventional, but one that precedes the "conventional" sales in interstate commerce with which Congress was concerned, indeed even precedes the "production and gathering" which Sec. 1(b) visualized as preceding the sale in interstate commerce over which jurisdiction was being established.
 
 
 35
 Turning to the "significant and determinative economic facts," basically the significant fact for a sale in interstate commerce is interstate movement either by the seller, prior to or in connection with the sale, or by the purchaser, typically an interstate pipeline company, subsequent to or in connection with the sale. In the case of a typical oil and gas lease, there is no such interstate movement by either the transferor or transferee.
 
 
 36
 In Rayne Field, the gas reserves were known and had been substantially developed by or in behalf of the lessees-producers. A gas lease, however, transfers only the right to explore, develop, and market if exploration is successful; no royalty is paid if no gas is discovered. In Rayne Field the lease-buyers were interstate pipeline companies--clearly "natural gas companies" under the Act--and it was known that the gas was destined for interstate commerce. As to leases of reserves from landowners to lessee-producers there is no knowledge when the lease is executed of the ultimate destination of any gas that might be discovered,[15] no knowledge whether the gas, if discovered, will be sold either to an interstate pipeline or to any other customer that will move it across state lines. While the lease by the landowner provides for a royalty in the event of the discovery and sale of gas, typically he has no control over any incident of such sale either as to the quantity to be sold, the price to be paid, the identity of the purchaser or whether it shall be sold in interstate or intrastate commerce. To refer to the royalty owner as engaging in the sale is to depart from the common understanding of the words used, industry parlance, economic equivalent, or any other foundation hitherto considered a source for discerning Congressional intention.
 
 
 37
 The Commission's approach was this, that when a landowner executes a "proceeds" or "value" lease "he has contracted to retain an economic interest in interstate sales by the producer," and "has joined the other interest owners in such sales and he has become a seller of natural gas."[16] But an economic interest in the proceeds of a sale, unaccompanied by authority to determine the incidents of the sale, does not make one a seller. The developer of a shopping center does not become a seller of food because he leases to a supermarket on percentage rental terms. A patentee who licenses various manufacturers on a royalty percentage basis is not generally considered the seller of the articles. Nor does the lessor become a seller of an article merely because the article was produced on or from the land that he leased. An owner of farmland leased to a farming tenant does not become a seller of produce raised because his rent may be a fraction of the price received for the crops. An owner of a mine leased to an operator does not become a seller of the ore produced because the stipulated compensation for the lease is a fixed fraction of the price received for the ore produced.
 
 
 38
 If the statutory use of "seller" or "sale" of natural gas in interstate commerce is referable to the meaning of these words in ordinary usage, or as likely understood by Congress, the FPC's ruling is clearly unsound. We do not think a different result warranted or mandated on the ground that the purpose of the Act is to protect the ultimate beneficiaries against exploitation by natural gas companies. That was indeed the objective of Congress, see FPC v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The FPC is to be commended for attempting to further that objective, but it is not sufficient justification upon which to base an expansion of the Act to activities clearly not within its terms. Congress did not give the FPC carte blanche to take whatever action it might consider appropriate in furtherance of this purpose. The FPC is limited by the provision establishing its jurisdiction, and we do not find in that provision, rooted as it is in a sale in interstate commerce, any basis for reaching out to cover the landowner's lease or its royalty payments. We think it too far removed from the interstate sale. When there is a sale of gas to a pipeline in interstate commerce, the FPC will of course have the jurisdiction and the responsibility to exercise control in the interest of the ultimate consumer.
 
 
 39
 We turn to a consideration of what may be implied as to jurisdiction from the requirement of effective Federal regulation of producers and pipelines. Of course for leases executed after this controversy took shape, it seems probable that producers will be able, and indeed have been able, to insist on leases drafted so as to avoid recurrence of the present controversies.
 
 
 40
 More significantly, the FPC's jurisdiction over rates chargeable by a producer includes authority to determine the reasonableness of costs incurred, even though these are not subject to direct FPC control, and that establishes authority to review royalty payments, or drilling rig rentals, or any other element of the producer's cost of service.[17] Permian Basin Area Rate Cases, 390 U. S. 747, passim and at pp. 824-825, 88 S. Ct. 1344, 20 L.Ed.2d 312 (1968). And we interject that this is the only approach that even the FPC has in mind for handling other elements of the total payments made by producers to landowners, e. g., the cash bonus, delay rentals.
 
 
 41
 Intervenor Shell Oil Co. put forward the contention that jurisdiction should rest on the burden created on interstate commerce by allowing royalty payments in excess of producers' rates. The Commission opinion stated that "since we find that an actual sale for resale by an interest owner does take place under the royalty provisions of the mineral leases the argument of Shell and Tenneco constitute an additional, but not the basic, reason for asserting jurisdiction."[18]
 
 
 42
 If an interpretative ruling stretching the Act as written to cover leases by landowners is to be countenanced on the score of necessity, and we do not say this will be possible, the underlying record must be more comprehensive and profound--broader and deeper, as it were--than the findings and analysis presented on this record. The case as it comes before us, with a cursory "makeweight" reference to a possible theory of economic burden, is in a wholly different posture from that presented in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), which held CATV systems to be within the Federal Communications Act's coverage of "all interstate and foreign communication by wire or radio", 47 U.S.C. Sec. 152(a), and relied significantly on the FPC's finding that achievement of its regulatory purposes would be placed in jeopardy by the unregulated growth of CATV.
 
 
 43
 As to the problem of economic burden and higher prices for consumers, although the record contains evidence and findings concerning different forms of industry contracts (see Appendix) we have no findings concerning the extent or significance of market price contracts. And the FPC's opinion gives no concrete indication of whether, in what circumstances, or to what extent, there may be an economically meaningful problem of "market prices" in excess of ceilings. In the Huber case the judgment entitling the royalty owners to pursue their claim made no determination of amounts of recovery. Apparently such litigation may come to involve substantial sums even if pursued so as to recover royalties based on ceilings higher than filed rates. This we infer from the fact that Mobil Oil and other producers have appealed from the ruling of the FPC that although the royalty owners' filing obligations are met by virtue of the filings made by the producers,[19] a royalty owner is not limited to the rate filed by the producer and may enforce his contract as calling for a higher rate if permitted by the Act.[20] The record simply does not focus on what may be involved in the possibility of recovery of royalty calculated on the basis of "market prices" higher than ceilings.
 
 
 44
 Questions have come to our mind concerning the FPC's theory as to how the royalty owners may be shoe-horned into the existing regulations, and we at least have it in mind that if the FPC's assertion of jurisdiction over royalty owners were sustained its regulatory problems might be more complicated than it has assumed.[21] To avoid any misunderstanding we interject that we have not been made uneasy by the contentions the producers have presented to us,[22] for we see no theoretical impediment to producers' being held on the basis of a contract to a royalty payment related to a base higher than the producers' filed rate. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). The producers make no claim, even obliquely, that they face financial or other difficulties requiring relief from contractual obligations, see Permian Basin Area Rate Cases, supra, 390 U.S. at 822, 88 S.Ct. 1344, 20 L.Ed.2d 312, and insofar as general equitable considerations are concerned we suppose the FPC may have had in mind that its area ceilings are predicated on an assumption of royalty costs at a conventional fraction of ceiling prices (see note 17, supra).
 
 
 45
 In any event we are not persuaded that the maintenance in either state or Federal courts of contract (lease) controversies between royalty owners and lessees will undercut the Federal regulatory system. The controversies hitherto delineated by the private parties have focused on the producers' assertion of the need of the royalty owners to abide by the producers' filings and receipts. The problem of relationship of market prices to producer ceilings presents different considerations.
 
 
 46
 Without purporting to rule on the matter in any way, we can certainly visualize the possibility that a court confronted with a contention of entitlement to a market price basis higher than the producer's ceiling would consider it to run counter to the intention of the parties, unless there is something to rebut the fair presumption that they contemplated interstate movement and market prices compatible therewith.[23] The court might also consider that this result would be in furtherance of the general principle against application of contracts so as to contravene public policy, whether or not the result would be in violation of supremacy clause doctrine prohibiting state rules or decisions that require a regulated company to take action inconsistent with Federal regulation, see Northern Natural Gas Co. v. State Corp. Comm. of Kansas, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963).[24]
 
 
 47
 The court handling the contract clause could avoid becoming embroiled in the ascertainment of the Federal ceiling by referring that issue to the FPC, invoking the broad and supple doctrine of primary jurisdiction, see J. M. Huber Corp. v. Denman, supra, 367 F.2d at 111; cf. Brawner Building Inc. v. Shehyn, 143 U.S.App.D.C. 125, 442 F.2d 847 (1971).[25] This would bring the FPC into the dispute between the royalty owner and the lessee-producer, but the FPC would be acting properly, on reference from the courts, rather than unduly stretching its jurisdiction and the statutory mandate to extend to royalty owners.
 
 Special Circumstances of Denman "R" Lease
 
 48
 While Commissioners Carver and O'Connor wrote strong dissenting opinions from the assertion of jurisdiction over the royalty interest in most gas leases, they agreed with the majority that variations in the Denman "R" lease rendered its royalties jurisdictional. Commissioner Carver found that the circumstances show "the lessor clearly identified his interests with those of the lessee-producer. The privity found lacking in the usual and normal leasing arrangement is supplied under these particular facts."[26] We do not consider this matter, as we do not know whether a majority of the FPC would have taken the same approach initially, or would wish to do so in the wake of our decision.[27]
 
 
 49
 Reversed.
 
 APPENDIX
 
 50
 Excerpts from Opinion of Presiding Examiner, see 42 FPC at 190, 191:
 
 
 51
 Every provision in a lease is open to negotiation, but not every provision is actually negotiated in every transaction. The most common items of negotiation between the lessor and prospective lessee are the amount of cash bonus, the amount of delay rental, the length of the primary term, and the royalty fraction.
 
 
 52
 The cash bonus is the cash consideration paid by the lessee to the lessor for granting the mineral lease and may range from a minimal amount to a substantial sum.
 
 
 53
 The delayed rental is a payment for the privilege of deferring the commencement of drilling operations or the commencement of production.
 
 
 54
 The primary term is the term of the lease during which the lease may be continued in effect without drilling operations or production by the payment of a delayed rental.
 
 
 55
 ******
 
 
 56
 * * *
 
 
 57
 The landowner may create by grant or by reservation various estates in land. The interest we are concerned with here is called royalty and is created by a reservation in an oil and gas lease in which the landowner grants to the lessee certain rights and privileges, such as, to explore, drill and produce oil and gas, and in the same instrument reserves to himself, free from the expenses of production, a share in the oil and gas produced or the proceeds thereof. Williams and Meyers, Oil and Gas Law, Manual of Terms, 342; Volume 1, secs. 202, 202.1, 202.3. This share is usually expressed in terms of a fraction of the production. The fraction is generally one-eighth and in some instances a larger amount. The royalty interest as to oil produced is usually taken in kind, but as to gas produced, while the right to take in kind may be reserved, it is seldom done as a practical matter due to its characteristics and the lack of market other than the pipeline to which the lessee delivers the gas. The common provisions in the leases for accounting to the lessor for royalty as to the gas produced provide for the lessee to pay the lessor for his fractional part the market value in the field or a percentage of the proceeds derived from the sale of the gas.
 
 
 58
 In addition to the lessor's royalty interest, there is also another type of royalty interest called an overriding royalty interest. Such interest is most commonly created when a lessee enters into a farm-out agreement with another producer. In such an agreement the lessee retains either an undivided interest in the leases or an override interest. Both the lessor royalty interest and the overriding royalty interest as a contractual matter receive their respective interests free of any of the costs of production, except for taxes. The working interest owners generally share the expenses of development and operation of the property, proportionate to their interest in the property. Although the overriding royalty interest owner is a bare holder of a right to receive proceeds, the lessor royalty interest owner is protected by certain implied covenants with respect to the development of a lease and the marketing of the product.
 
 
 59
 ***
 
 
 60
 * * *
 
 
 61
 In Docket No. RI67-113, there are involved three leases as to mineral rights in Texas, designated as the "R Lease" entered into on June 2, 1936, the "B Lease" and the "M Lease" on January 22, 1926. The royalty provision insofar as necessary for consideration here, under the "R Lease" which accounts for 93 percent of the production of gas provides for Huber, the lessee:
 
 
 62
 To pay the Lessors monthly for one-fourth ( 1/4) of the gas produced at the mouth of the well from any gas well, where gas only is found, four cents per one thousand cubic feet for the first ten years of this contract, and thereafter, the market price of such gas but in no event shall the price be computed at less than four cents per one thousand cubic feet.
 
 
 63
 Under the B and M Leases the royalty clause provides:
 
 
 64
 To pay the Lessor the equal one-eighths part of the market value in the field for the gas from each well where gas only is found, while the same is being used off the premises, * * *
 
 
 65
 The type of lease varies as to mineral rights in Kansas under Docket Nos. RI67-114, RI67-310 and RI67-400. The royalty clauses in the leases here necessary for consideration generally provide for the lessee to pay the lessor on gas marketed from each well where gas only is found one-eighth of the proceeds if sold at the well, or if marketed by the lessee off the premises, then one-eighth of its market value at the well. Some of the leases set forth only a proceeds type royalty clause and others only a market type royalty clause. Regardless of the type of royalty clause set forth in the leases involved in these proceedings, the landowners claim entitlement at the market price.
 
 MacKINNON, Circuit Judge (concurring):
 
 66
 I agree with the result and with the opinion insofar as it decides issues in this case. However, with respect to future cases that might involve the relationship of market prices to producer ceilings, I see no necessity to discuss the effect of the intent of the parties, public policy, federal supremacy, or the use of primary jurisdiction.[1]
 
 ORDER
 
 67
 PER CURIAM.
 
 
 68
 On December 30, 1971 petitioner filed a petition for rehearing. Respondent filed a response thereto on January 24, 1972. On January 28, 1972 William Harvey Denman et al. filed a motion for leave to respond to the petition for rehearing. On March 6, 1972 an order was entered granting the conditional request of William Harvey Denman et al. for permission to respond to the petition for rehearing and extending the time for the filing of a response to and including March 16, 1972. No response has been filed, and on due consideration, it is
 
 
 69
 Ordered by the Court that the petition for rehearing is granted to the extent of clarifying that it is the court's intention in reversing to permit, but not to require, the Federal Power Commission to enter a further order in regard to the "R" Lease controversy, as it may be advised after further proceedings, not inconsistent with the opinion of this court.
 
 
 
 [1]
 R. 4459; 42 FPC at 198
 
 
 [2]
 R. 5045; 42 FPC at 174
 
 
 [3]
 Id
 
 
 [4]
 42 F.P.C. at 172
 
 
 [5]
 15 U.S.C. Sec. 717a(6)
 
 
 [6]
 Certainly Congress did not intend to create a state checkerboard of federal regulation and non-regulation depending on the varying concepts under local law of the leaseholder's interest
 
 
 [7]
 McNally v. Hill, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934); see Old Colony RR v. Comm'r, 284 U.S. 552, 560, 52 S. Ct. 211, 76 L.Ed. 484 (1932)
 
 
 [8]
 15 U.S.C. Sec. 717a
 
 
 [9]
 Among the classifications found by one text writer, with numerous citations to each one (omitted here) are: profit a prendre, corporeal hereditament, incorporeal hereditament, an estate in land, not an estate in land, an estate in oil and gas, not an estate in oil and gas, a servitude, a chattel real, real estate, interest in land, not an interest in land, personal property, a freehold, a tenancy at will, property interest, and the relation of landlord and tenant. 1A W. Summers, Law of Oil and Gas Sec. 152 at 371-374 (2d ed. 1954). He concludes, "Perhaps sometime courts and legislatures will recognize the fact that oil and gas leases are different from other forms of contracts and conveyances, and that the interests created by them cannot be properly classified under common interests in property, and will speak of such interests as the interest of an oil and gas lessee. . . ." Id. at Sec. 153, p. 382
 
 
 [10]
 We put to one side any special case of a landowner who takes a share of the gas produced as his royalty and resells it
 
 
 [11]
 See 367 F.2d at 113-114:
 "[The lessors make] the very simple, yet profound, contention that there can be no 'sale' of gas by royalty owners since they have no gas to sell. And this seems to be true as a matter of oil and gas law, whether based on the owner-ship-in-place concept followed by Texas and others or on non-ownership theories of other jurisdictions. For all agree that as the gas leaves the well-mouth, the entire ownership of the gas is in the lessee, none being reserved in the lessor."
 Judge Brown's citations reveal that even in Texas, where a lease constitutes a present sale of all the gas in place, the royalty owner possesses some property right in the minerals.
 
 
 [12]
 Von Baumbach v. Sargent Land Co. is one of the Minnesota Royalty Cases involving state leases of iron ore lands. The leading case thereon points out that mineral leases were developed under the law of tenancy and not through the law of sales. Thus the miner never got his title to his mineral through a sale by the owner but rather as a product of the use for which rent was paid and title was acquired by an appropriate use of the leased premises. State v. Evans, 99 Minn. 220, 108 N.W. 958, 960 (1906)
 
 
 [13]
 See 347 U.S. at 682, 74 S.Ct. at 799
 
 
 [14]
 The FPC's decision in Rayne Field observed that it "would exalt form over substance, would give greater weight to the technicalities of contract draftsmanship than to the achievement of the purposes of the Natural Gas Act, and would impair our ability to control the price received for gas sold to the pipelines in interstate commerce to the detriment of the ultimate consumer" to hold that it had no jurisdiction. 29 FPC 249, 256, quoted at 381 U.S. at 398, 85 S.Ct. at 1521
 
 
 [15]
 The producer is a natural gas company because of the interstate movement conducted either by him or by his customer, assuming he discovers gas and makes a sale in interstate commerce
 
 
 [16]
 R. 542, 42 FPC at 172
 
 
 [17]
 In the Permian Basin area rate decision, eventually sustained by the Supreme Court, the FPC calculated the average cost of producers affected, as to royalty payments, on an assumption of 12 1/2% of total cost of service (including return on capital). FPC opinion No. 468, 34 FPC 159, at 192 (1965)
 
 
 [18]
 42 F.P.C. at 172, 173, R. 5043
 
 
 [19]
 The FPC stated (42 FPC at 173, R. 5043) that by operation of the law the jurisdictional royalty interest has in effect been covered by the producer filing since 1954, on the same theory as a producer's filing covers the interests of all non-signatory parties, and should continue to be so covered. Therefore the FPC concluded no amendment or extension of existing rules was needed
 
 
 [20]
 "Where he [the royalty owner] has contracted for the market price or value it would appear that he has contracted for a payment equal to the maximum rate for such gas which could have been received [by the producer] as fixed under the law by this Commission. . . . Where no just and reasonable rate has been fixed and the producer has agreed to pay the royalty interest owner more than he himself receives for the gas, we believe that the basis of the effective rate [the rate filed by the producer] subject to adjustment when the just and reasonable rate is determined." 42 FPC at 174
 
 
 [21]
 We are puzzled by the FPC conception that royalty owners are, and have since 1954 been, natural gas companies under the Act, limited under Sec. 4 of the Act to their rates as filed, even though they have not made filings and indeed could not have made filings, and by the corollary conception that the royalty owners are deemed covered by the filings made by the producers yet may now sue the producers for a higher basis
 It is one thing to consider a nonsignatory represented by the signatory when they have a common interest. But as we see it the reason why the FPC is asserting jurisdiction over the royalty owner is to handle the situation of a controversy between royalty owner and producer, and we are at least uneasy with an analysis whereby the royalty owner makes his filing by incorporation within the producer's filing and yet is free to seek a higher basis. If the royalty owners should recover on a basis of a market value higher than the rate that was filed by producers, it is difficult to discern how they may be deemed in compliance with the obligation of natural gas companies, for any sale subject to the jurisdiction of the FPC, to charge only the rate that is set forth in a public schedule filed with the Commision. It seems clear that the provisions of the regulations do not fit lessors.
 We are also uneasy with the FPC's assumption that there can be no controversy between the landowner and the producer if an area ceiling is established. As we understand it the royalty owner was not, and apparently could not have been, a party to the area rate proceeding. If this is correct, it is not easy to see on what basis he can be held concluded by what has been established in such a proceeding, whether on conventional findings, or following a settlement.
 
 
 [22]
 They complain that they are made subject to immediate contingent liabilities to make retroactive royalty payments if the FPC authorizes area rates higher than those previously filed by the producers even though the producers are prohibited from retroactively adjusting their rates
 
 
 [23]
 Compare Permian Basin Area Rate Cases, supra, 390 U.S. at 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 et seq., upholding departure from field prices in the public interest on the ground, inter alia, that various significant increases in field prices were "symptomatic of the deficiencies of the market mechanism."
 
 
 [24]
 The question would arise whether a decision requiring a producer to pay the royalty owner on a basis higher than his Federal ceiling would be interfering with his carrying on interstate commerce conformably with the conduct prescribed for the producer by the Federal regulatory agency
 The question might be obviated in a particular case if the court discerned an intrastate market, capable of absorbing the volumes involved, not subject to any Federal ceiling.
 
 
 [25]
 The producer could file for a declaration of ceiling, with notice to the royalty owner as party affected
 
 
 [26]
 R. 5057, 42 F.P.C. at 183
 
 
 [27]
 Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967)
 
 
 [1]
 See majority opinion, pp. 265-266, inclusive