MARVIN, Judge.
In Harris v. Arkansas Louisiana Gas Co., 357 So.2d 1249 (La.App.2d Cir. 1978), we affirmed a preliminary injunction that prohibited Arkla from connecting its inter state pipeline to a gas well on plaintiff’s property when it was shown that the well had been first connected by the well operator to an intra state pipeline. The preliminary injunction was upheld to avoid the lower court being divested of jurisdiction to determine under state law whether or not the second pipeline was necessary as required by the lease provisions. That appeal was by Arkla.
From a judgment on the merits rejecting plaintiffs’ demands for a permanent injunction, this appeal was taken by plaintiffs.
The result of the judgment below is to relegate plaintiffs’ remedy to a claim either for damages or for additional royalty which might be owed because the lease provides that plaintiffs shall be entitled to royalty equivalent to market value.[1] Arkla was assigned 25 percent of the working interest in the well, the production from which it is entitled to take in kind. The original lessee or other assignees own the remaining 75 percent working interest, the production from which has been sold intrastate. These assignees have refused to allow Arkla to extract its portion of production from the intrastate pipeline to avoid exposing their production to possible interstate regulation. Intrastate gas, being unregulated, may be sold to the ultimate consumer at a higher price than interstate gas. Arkla proposes to “split stream” or to divert its share of production at the well head into its separate pipeline.
Thus the crucial issue, even though labeled as secondary to the question of the necessity of the interstate pipeline, is whether or not plaintiffs will be deprived of a remedy under state law which might compel Arkla to pay on its 25 percent of production, royalty equivalent to market value as provided by the lease, IF market value should be determined to be the higher intrastate price, and notwithstanding that Arkla contracted to sell and has legally dedicated its gas subject to federal interstate regulation. Our consideration of federal cases is imperative because these cases, interpreting federal law, determine the extent of the jurisdiction remaining in the state courts.
Factual Background
Plaintiffs leased to Bradco, original lessee, in 1975. Bradco assigned 25 percent of its working interest to Arkla Exploration in 1976. On July 25, 1977, by a gas purchase contract, Arkla Exploration sold to its parent company, Arkla Gas, its share of production from about 15 leases in the area, including plaintiffs’ lease, together with the right to lay pipelines for the delivery of gas into the Arkla interstate distribution system.[2]
Plaintiffs’ lease covers 480 acres in Section 8. The other leases referred to cover lands in Sections 4 and 9, Township 18 North, Range 13 West, Lincoln Parish. These three sections are contiguous. Arkla eventually applied for and obtained from the Federal Energy Regulatory Commission (FERC, formerly FPC) authority to deliver in interstate commerce, gas from wells in the three sections (plaintiffs’ well — called *937 the Heard well — in Section 8, the Sturgis-Nix well in Section 4 and the Wilder well in Section 9). This authority was granted by FERC order of December 6,1977. On February 4, 1978, Arkla began delivering gas from the Wilder well into its interstate pipeline. It was an extension of this pipeline and its proposed connection to the Heard well which provoked this lawsuit, as illustrated by this diagram:
[[Image here]]
Plaintiffs did not show that any actual or contemplated use or peculiarities of the land would have been affected by Arkla’s connecting its pipeline to the well. Plaintiffs showed that 100 percent of production from the Heard well had been devoted to an intrastate market and contended that it was unnecessary for Arkla to market its share of the gas interstate. Plaintiffs argued below and here that because federal preemption precludes a state court from ordering an interstate working interest owner from paying royalty to a lessor based on a price above the regulated interstate gas price, a second pipeline for interstate purposes would be patently unnecessary and grossly unfair to plaintiffs. This argument is based on the premise that once the gas is dedicated to interstate use under federal law, the federal courts and FERC have the exclusive authority to determine the price which may be paid for gas from the time of its capture to the time it is ultimately consumed.
A related question stems from Art. 122 of the Louisiana Mineral Code (LRS 31:122) which provides:
“A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.”
Plaintiffs argue in this respect that the lease provision requiring that the pipelines be necessary should be interpreted in light of the lessee’s statutory obligation to reasonably and prudently develop and operate the leased property for the mutual benefit of the lessee and the lessor. Plaintiffs contend the Arkla pipeline is not necessary because the sale of a portion of gas interstate at a price lower than is being paid intrastate for the total production would be *938 a violation of the lessee’s prudent development obligation.[3]
Federal Preemption
The regulatory power of the FERC through the Natural Gas Act (15 U.S.C.A. §§ 717 et seq.) applies only to natural gas transported in interstate commerce, its sale in interstate commerce for resale, and natural gas companies engaged in such transportation or sale. 15 U.S.C.A. § 717(b); Federal Power Commission v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).
In Mobil Oil Corporation v. Federal Power Commission, 149 U.S.App.D.C. 310, 463 F.2d 256 (1971) cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed. 676 (1972), the court held that FPC — FERC had no jurisdiction over royalty payments to royalty owners who have retained a percentage interest in gas sold in interstate commerce.
Finding there was no “sale” in interstate commerce within the meaning of 15 U.S. C.A. § 717(b), the court concluded:
“The FPC is limited by the provision limiting its jurisdiction, and we do not find in that provision, rooted as it is in a sale of interstate commerce, any basis for reaching out to cover the landowner’s lease or its royalty payments. We think it is too far removed from the interstate sale.” 463 F.2d at 263.
There is then a crucial distinction between federal regulation of rates charged by producers who sell gas in interstate commerce and the absence of federal regulation of royalty payments themselves.
The FERC considers the amount of the royalty payment only to the extent to which the payment affects the cost of service. Mobil succinctly explained this limited consideration:
“(T)he FPC’s jurisdiction over rates chargeable by a producer includes authority to determine the reasonableness of costs incurred, even though these are not subject to direct FPC control, and that establishes authority to review royalty payments, or drilling rig rentals, or any other element of the producer’s cost of service. Permian Basin Area Rate Cases, 390 U.S. 747, passim and at pp. 824-825, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). And we interject that this is the only approach that even the FPC has in mind for handling other elements of the total payments made by producers to landowners, e. g., the cash bonus, delay rentals.” (Emphasis added). 463 F.2d at 263.
Placid Oil Company v. Federal Power Commission, 483 F.2d 880 (5th Cir. 1973), followed Mobil. While acknowledging royalty payments were relevant as to service cost interstate rate computations, Placid specifically reserved the determination and enforcement of royalty obligations to state law:
“Of course the royalty obligations of the producers are cost components of the rate structure. Any alteration of this component would necessarily alter the departure point of the rate calculations. And under the holding of the D. C. Circuit in Mobil, this would be an Erie determination of the contract stating the royalty percentage based upon the applicable principles of state law — totally beyond the control of the federal regulatory agency charged with the responsibility of regulating natural gas rates . . .”
“If, as subsequent events develop, the producers are put in a bind by their royalty obligations, they may certainly petition FPC for individualized relief.” 483 F.2d at 911.
The Fifth Circuit recently reiterated the existence of the distinction in Pennzoil Producing Co. v. Federal Power Commission, 553 F.2d 485 (5th Cir. 1977), on rehearing, 558 F.2d 816, cert. granted,-U.S.-, *939 98 S.Ct. 3068, 57 L.Ed.2d 1120 (1978). There interstate gas producers, “caught in the squeeze between the regulated price of its gas, which price included royalty costs at the interstate price, and the claims of landowners for increased royalty payments based on higher intrastate rates,”[4] petitioned the FPC for relief, as provided by the Natural Gas Act and contemplated by Placid. The court, citing Mobil, delineated the jurisdiction of the FPC:
“Although the FPC does not have jurisdiction over the amount paid royalty owners, Mobil Oil Corp. v. FPC, 149 U.S. App.D.C. 310, 463 F.2d 256 (1971) cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972), it does have authority over interstate rates charged by the producers.” (Emphasis added) 553 F.2d at 487.
Pennzoil held that the FPC had the authority to allow gas producers’ interstate price to be increased by the amount of increased royalty payments the producers were required to pay to royalty owners.
Plaintiffs additionally contend that if Arkla is allowed to connect the interstate pipeline to the Heard well, the gas attributable to Arkla’s interest will be permanently dedicated to interstate commerce and permanently placed under the exclusive jurisdiction of federal authority. This threatened dedication, plaintiffs say, will cause plaintiffs irreparable injury. This argument overlaps and is corollary to plaintiffs’ argument first discussed.
The recent case of California v. Southland Royalty Co., 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978) illustrates the effect of the legal dedication feared by plaintiffs. There a lessee was given the right to produce and market gas for a period of 50 years. When the lease expired in 1975, the lessee’s interest in the gas in place terminated and reverted to Southland Royalty Company and others under state law. Following Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960), the court held that under 15 U.S.C.A. § 717f(b),[5]
The Commission may therefore control both the terms on which a service is provided to the interstate market and the conditions on which it will cease:
“An initial application of an independent producer, to make movements of natural gas in interstate commerce, leads to a certificate of public convenience and necessity under which the Commission controls the basis on which ‘gas may be initially dedicated to interstate use. Moreover, once so dedicated there can be no withdrawal of that supply from continued interstate movement without Commission approval.’ ” 98 S.Ct. at 1958.
Dedication was effected in the Southland case under the Natural Gas Act when the lessee obtained in 1956 an order from FPC (Certificate of Public Convenience) authorizing the sale in interstate commerce of gas produced from the lease to an interstate pipeline company under a gas purchase contract.
In this case, Arkla Exploration, by the gas purchase contract of July 25, 1977, contracted to sell its share of production from about 15 leases, including plaintiffs’ lease, in Sections 4, 8 and 9 as shown on the diagram reproduced above. On December 6, 1977, FERC, by a Certificate of Public Convenience, authorized the sale or introduction into interstate commerce of gas from the contract leases in the three sections. On February 4,1978, the transportation of gas from the Wilder well in Section 9, into the interstate pipeline began. We need not decide whether this had the effect of dedicating under the Natural Gas Act all *940 of the gas owned by Arkla under the leases in the three sections, including Arkla’s gas from plaintiffs’ lease. Whatever the status of Arkla’s gas under the Natural Gas Act, we are not free to interfere with or enjoin the flow of Arkla’s gas into interstate commerce. See authorities in footnote 3.
The authorities in any event are clear in our interpretation that the determination of the amount of royalty to be paid by a lessee to a royalty owner is not subject to regulation under the Natural Gas Act even though the gas is about to enter or has entered interstate commerce.
Our holding is that plaintiffs have a remedy under state law which might compel Arkla to pay, on its interstate gas, royalty based on a higher intrastate price, if the term “market value” in the lease should be determined to mean something more than the price received at the well head by Arkla Exploration from Arkla Gas. The lower court did not err in denying the permanent injunction.
For reasons summarized here and also detailed below in an excellent written opinion, at appellants’ cost, judgment is
AFFIRMED.

. Par. 3(b) of the lease provides in part that the royalty on gas shall be . . the market value at the well of one-eighth of the gas so sold ...”

. The lease to Bradco gave the lessee the privilege of “. . laying pipelines which may be necessary, useful or convenient to . . . operations conducted by lessee.”

. The comments under Art. 122, as well as Articles 137-141 of the Mineral Code, do lend some support to this contention. The logical end of this reasoning, however, would result in state law saying that a mineral lessee shall not be allowed to sell gas interstate if the interstate price is lower than the intrastate price. Such a result is clearly prohibited by the Interstate Commerce Clause of the U. S. Constitution, Art. 1, § 8. See H. P. Hood & Sons, Inc. v. Dumond, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865, 873 (1949).

. The leases involved in Pennzoil also required royalty payments of market value of the gas.

. “No natural gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permits such abandonment.”