

# The Attorney General of Texas

December 31, 1982

MARK WHITE
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

1607 Main St., Suite 1400
Dallas, TX. 75201-4709
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1220 Dallas Ave., Suite 202
Houston, TX. 77002-6986
713/650-0666

606 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/382-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Mr. Bob Armstrong
Commissioner
General Land Office
1700 North Congress
Stephen F. Austin Building
Austin, Texas    78701

Opinion No. MW-550

Re:  Interpretation of royalty
provisions of state leases on
lands dedicated to the Permanent
School Funds and Permanent
University Fund

Dear Mr. Armstrong:

You have requested an opinion from this office regarding the
calculation of royalties due for gas produced from state leases where
the state's lessee sells the gas pursuant to a contract which provides
that the purchaser reimburse the lessee for any severance tax paid in
regard to the production of that gas.

The current General Land Office lease form, "Revised Lease Form
9-81," provides:

> The Lessee agrees to pay... (B) Non-Processed gas:
> As a royalty on gas... _____ part of the gross
> production or the market value thereof, at the
> option of the Lessor, such value to be based on
> the highest market price paid or offered for gas
> of comparable quality in the general area where
> produced and when run, or the price paid or
> offered to the producer, whichever is the
> greater....

The instant question arises only where the state has elected to take
its royalty in cash rather than in kind. Although questions
concerning the effect of federal price controls have been raised and
will be addressed, this opinion will initially address the issues on
the assumption that prices are not governmentally established.

A hypothetical may help explicate the analysis of these issues.
Assume that "A" leases permanent school fund lands productive of gas
at a one-fifth royalty. In the relevant month "A" produces one
thousand mcf of gas. "A" has a contract with "B" for the sale of all
gas produced at the price of $5.00 per mcf plus any severance tax paid
by "A" as a result of such production.

A brief discussion of the Texas severance tax on gas is necessary prior to pursuing that hypothetical further. Section 201.051 of the Tax Code provides: "There is imposed a tax on each producer of gas." Section 201.052 further provides:

> (a) The tax imposed by this chapter is at the rate of 7.5 percent of the market value of gas produced and saved in this state by the producer.

Sections 201.101 and 201.102 respectively provide:

> The market value of gas is its value at the mouth of the well from which it is produced.

> If gas is sold for cash only, the tax shall be computed on the producer's gross cash receipts. Payments from the purchaser of gas to a producer for the purpose of reimbursing the producer for taxes due under this chapter are not part of the gross cash receipts.

Section 201.001(5) defines producer to include royalty owner. The state, however, has been held to be exempt from severance tax liability even though as a royalty owner it falls within the statutory definition of producer. Group Number 1 Oil Corporation v. Sheppard, 89 S.W.2d 1021 (Tex. Civ. App. - Austin 1935, writ ref'd). Under section 201.051, the tax collection obligation is imposed on the gas producer.

Returning to the above hypothetical, further assume that there has been no increase in severance tax since the execution of the contract between "A" and "B". Cf. Attorney General Opinion H-176 (1973). Thus, we see the following payments made:

Price:

| | | |
|---|---|---|
| Total Production | 1000 | mcf |
| Times Base Price | x$5 | mcf |
| Total Base Price | $5000 | |
| | | |
| Total Base Price | $5000 | |
| Times % Necessary to Yield $5/mcf Net of Severance Tax | x.081 | |
| Equals Severance Tax Due on Entire Production | $ 405 | |
| Times Non-Exempt Producer's Share of Production | x.80 | |
| | | |
| Equals Total Severance Tax Paid and Reimbursed | $ 324.00 | |
| Plus Total Base Price | $5000.00 | |
| Equals Gross Price | $5324.00 | |

State's Royalty:

GLO Method:

| | |
|---|---|
| Gross Price | $5324.00 |
| Times Royalty Percentage | x.20 |
| Equals Minimum Amount of Royalty | $1064.80 |

Producer's Method:

| | | |
|---|---|---|
| Total Production | 1000 | mcf |
| Times Royalty Share | x.20 | |
| Equals State's Share of Production | 200 | mcf |
| Times Base Price | x$5 | mcf |
| Equals Minimum Amount of Royalty | $1000 | |

Under either method of royalty calculation both the gross price and the severance tax amount remain the same.

Under the assumed facts, where the price is a negotiated one, "the gross price paid or offered to the producer" is $5,324.00 for one thousand mcf of gas. Thus, the state's royalty of twenty percent of the market value of the gross production is a minimum of $1,064.80, not $1,000.00. The royalty due may be higher than that if comparable sales dictate that result but it cannot be less.

Certain producers, in advocating the second royalty calculation method noted above, have contended that it is inequitable to reach the foregoing conclusion because to do so results in the state receiving more for its portion of total production than the producer receives. Under the approach advocated by those producers, both the state and the producer would be compensated at a rate of $5.00 per mcf net of severance tax. This result strikes those producers as the only just result. The result, however, is that the state receives a lower royalty than the producer who is liable for severance tax. Severance tax liability is a cost of doing business to which the state is not subject. Adopting a formula to protect producers from that expense is no more justified than adopting one which takes into account, for example, federal income tax liability.

The argument made by those producers seems premised on the misapprehension that the severance tax is paid on particular units of gas, like an ad valorem tax. It is not. It is a tax on the privilege of engaging in the business of producing gas in Texas which is computed on the basis of the amount of gas produced.

The conclusion advocated by those producers does not, in any event, follow from the analysis which they make. If the state's fractional part of production, that is, the percentage of production reflected in the state's royalty share, is, as those producers advocate it should be, segregated from the total production in measuring the royalties due to the state the result is a higher royalty than that resulting from the calculation advocated by the

General Land Office. The result of that analysis is that there are, in effect, two sales of gas: one sale of 200 mcf of gas at $5.00 per mcf reflecting the state's share, and one sale of 800 mcf of gas at $5.405 per mcf, reflecting the producer's share. Since the producer's share is a directly comparable sale under free market conditions, the characterization of the transaction between "A" and "B" in that manner results in the state receiving 200 mcf times $5.405 per mcf or $1,081.00 rather than the $1,064.80 resulting from the General Land Office's method of calculation. That result, however, is artificial since the transaction is, in fact, only one sale of gas. The purchaser has agreed to pay and the producer has agreed to accept $5,324.00 for 1000 mcf of gas, not $1,000.00 for 200 mcf and $4,324.00 for 800 mcf.

Thus, absent price controls, the state's royalty is to be calculated on the basis of the entire consideration paid to the state's lessee for the production from the state lease including severance tax reimbursement. Whether the existence of the Natural Gas Policy Act of 1978 (hereinafter NGPA), 15 U.S.C. section 3301 et seq., alters this result as to production covered by its terms will be discussed next.

The NGPA sets ceiling prices on initial sales of natural gas. Title 15, section 3320 of the United States Code provides:

> (a) a price for the first sale of natural gas shall not be considered to exceed the maximum lawful price... if such first sale price exceeds the maximum lawful price to the extent necessary to recover -- (1) State Severance taxes attributable to the production of such natural gas borne by the seller....

Thus, one who has natural gas which has not previously been sold can sell that gas for the applicable ceiling price plus any applicable severance taxes for which that individual is liable. The fact that section 201.001 of the Tax Code defines producer to include royalty owner and that the state, although nominally a producer where it owns royalty interests, is exempt from severance tax liability does not make the state a seller within the meaning of the NGPA and, therefore, subject to the price limitations.

If we amend the foregoing hypothetical so that the gas produced by "A" is subject to the NGPA's price ceiling and the base contract price of $5.00 per mcf of gas is the ceiling price, we have the same economic result between "A" and "B". The royalty calculation issue, however, requires additional analysis due to the supreme court's holding in Exxon v. Middleton, 613 S.W.2d 240 (Tex. 1981), that the status of gas under federal price control is relevant to the determination of market value for royalty calculation purposes.

As noted above, the transaction between "A" and "B" can be characterized as, in effect, two sales:  one of the state's 200 mcf of gas, as to which no severance tax is due for the $5.00 ceiling price; and one of "A's" 800 mcf of gas, as to which severance tax is due for the $5.00 ceiling price plus $.405 per mcf as severance tax reimbursement.  If this characterization is legitimate, then the state's gas sold for $5.00 per mcf and the sale of "A's" gas for $5.405 per mcf is not a comparable sale under the Middleton analysis. From "B's" perspective, however, the transaction appears different. "B" purchases 1000 mcf of gas for $5,324.00, or for $5.324 per mcf.

As noted above, the severance tax is an occupation tax not an ad valorem tax.  The use in our hypothetical of 80% of the total production as a basis of calculating the severance tax due from "A" does not imply that there are two sales of gas.  That calculation merely reflects an allocation of the tax liability resulting from that production activity.  The tax liability is necessary because the severance tax statute defines producer to include royalty owner.  The NGPA does not purport to limit the amount of royalty which may be paid for gas produced.

The state owns a royalty interest.  A royalty owner's right to receive payment of the money due upon production is a contractual right to a money judgment.  Shell Oil Company v. State, 442 S.W.2d 457 (Tex. Civ. App. - Houston [14th Dist.] 1969, writ ref'd n.r.e.).  The result in that case is not inconsistent with the taxability of the royalty interest as an interest in real property under the ad valorem tax statutes.

We note that a federal district court in Oklahoma has construed section 3320 of the United States Code differently.  See Hoover and Bracken Energies, Inc. v. United States Department of the Interior, No. 81-461-T (W.D. Okla., filed Nov. 18, 1981).  However, this ruling is not binding upon us, it is on appeal, and appears to be inconsistent with Mobil Oil Corporation v. Federal Power Commission, 463 F.2d 256 (D.C. Cir. 1972).

In summary, there is only one sale of 1000 mcf of gas and the state is entitled, as its royalty, to a minimum of 20% of the consideration paid by "B" and received by "A" in that sale.  "A" is making, just as in the free market situation, one sale of gas for $5.00 per mcf plus any severance taxes due.

The foregoing result is to be distinguished from the result under the NGPA, 15 U.S.C. section 3316(b), Intrastate Rollover Contracts. Part (2)(A) of that subsection provides:

> In the case of any first sale under any [intrastate] roll-over contract of natural gas... which constitutes a State government's... natural gas production, or royalty share or other

> interests... in natural gas production... the maximum lawful price... shall be the maximum lawful price... under section 3312.

This constitutes an exception to a general rule under section 3316(b) which provides for a maximum price of $1.00 (adjusted for inflation) or the old contract price, whichever is higher, for intrastate rollover contract gas. This price will generally be less than that allowed for the natural gas constituting the state's royalty share. The effect of section 3316(b) of the NGPA is to create two categories of gas, that is, to work the kind of segregation of the hypothetical 100 mcf of gas which certain producers have advocated. The fact that the terms of the NGPA do not alter the state law regarding the obligations among the parties is irrelevant. By its very terms, section 3316 segregates, for the purpose of determining price, the gas attributable to the state's royalty interest from the remainder of the gas produced.

## S U M M A R Y

> The state's royalty on gas is calculated on the basis of the market value of the gas produced, but is in no event less than "the price paid or offered to the producer." There is no basis in law for the treatment of the sale as, in effect, two sales at different prices, one of that percentage of the gas equal to the state's royalty percentage and one of the remainder of the gas produced. The state is entitled to, at minimum, its royalty percentage of the total consideration including any severance tax reimbursement received by the lessee/producer without regard to how that total is calculated.

Very truly yours,

M A R K    W H I T E
Attorney General of Texas

JOHN W. FAINTER, JR.
First Assistant Attorney General

RICHARD E. GRAY III
Executive Assistant Attorney General

Prepared by Carl Glaze
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Susan L. Garrison, Chairman
Jon Bible
Rick Gilpin
Carl Glaze
Patricia Hinojosa
Jim Moellinger