## UNITED GAS IMPROVEMENT CO. *v.*
## CONTINENTAL OIL CO. ET AL.

No. 644.   Argued April 28, 1965.—Decided June 1, 1965.*

---

*Together with No. 693, *Federal Power Commission* v. *Marr et al.,* also on certiorari to the same court.

*William T. Coleman, Jr.,* argued the cause for petitioner in No. 644. With him on the briefs were *Richardson Dilworth* and *Harold E. Kohn.*

*Solicitor General Cox* argued the cause for petitioner in No. 693. With him on the briefs were *Ralph S. Spritzer, Frank Goodman, Richard A. Solomon, Howard E. Wahrenbrock, Robert L. Russell* and *Peter H. Schiff.*

*David T. Searls* argued the cause for respondents in both cases. With him on the brief were *Abe Fortas, Bruce R. Merrill, Lloyd F. Thanhouser, W. McIver Streetman, Stanley M. Morley, Donley C. Wertz, John T. Guyton, Robert E. May, John A. Ward III, Herf M. Weinert* and *W. D. Deakins, Jr.*

Briefs of *amici curiae,* urging reversal, were filed by *Richard E. Tuttle* and *J. Calvin Simpson* for the State of California et al. in No. 693, and by *John Ormasa, L. T. Rice, Milford Springer, J. David Mann, Jr.,* and *John E. Holtzinger, Jr.,* for Southern California Gas Co. et al. in both cases.

MR. JUSTICE HARLAN delivered the opinion of the Court.

In *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672, the Court held that Federal Power Commission jurisdiction under the Natural Gas Act, as amended, 52 Stat. 821, 15 U. S. C. § 717 *et seq.* (1964 ed.), extended to what are described colloquially and perhaps somewhat loosely as "wellhead" sales of natural gas by producers to interstate pipeline companies for resale in interstate commerce. The issue in the present cases is whether sales to an inter-

state pipeline company of leases covering proven and substantially developed reserves of gas to be sold in interstate commerce are also subject to Commission jurisdiction. We hold that they are.

## I.

In 1957, Texas Eastern, a natural gas company which owns and operates an interstate transmission system extending from Texas to the Philadelphia-Newark area, executed gas purchase contracts with Continental Oil Company, M. H. Marr, Sun Oil Company, and General Crude Oil Company, to purchase their natural gas production in Rayne Field, Louisiana, at an initial price of 23.9¢ per Mcf.[1] The producers applied to the Commission for certificates of public convenience and necessity authorizing them to sell their gas to Texas Eastern. Texas Eastern applied for a certificate permitting it to build new pipeline facilities to connect its system to Rayne Field. After a hearing, and in spite of objections by several intervenors to the 23.9¢ price, the examiner issued a decision recommending a grant of the requested certificates. However, before the Commission acted on the examiner's decision, the Court of Appeals for the Third Circuit handed down its decision in *Public Serv. Comm'n of New York* v. *FPC*, 257 F. 2d 717[2] (the *"Catco"* case), reversing an order of the Commission granting unconditional certificates for sales of natural gas on the ground that the certificate applicants had the burden of showing that the proposed sale price of 22.4¢ was justified by public convenience and necessity, and that the burden had not been sustained. Thereafter the producers in the present case requested the Commission to permit withdrawal of their applications for sales to Texas Eastern at

---

[1] The price included 1.3¢ per Mcf. for reimbursement of state taxes.

[2] Affirmed *sub nom. Atlantic Refining Co.* v. *Public Serv. Comm'n of New York,* 360 U. S. 378.

23.9¢ (1.5¢ higher than the Catco price) and canceled the sales contracts. The parties then agreed on a different method for achieving their objectives.

Under the new plan formulated by the parties, Texas Eastern, instead of making conventional wellhead purchases of natural gas, proposed to buy the producers' leasehold interests in the Rayne Field lands in which the natural gas was located. The provisions of the lease-sale agreements were such that they were very close in economic effect to conventional sales of natural gas. The gas reserves in Rayne Field were proven, and the field substantially developed.[3] Texas Eastern was still to build the connecting facilities to the field which had been called for under the original plan, and the same volumes of gas were to flow into its system. The lease-sales were to cover no minerals except natural gas and condensate, all other mineral rights being reserved to the lease-sellers, and by a management agreement Continental Oil, one of the sellers, was to continue to do the bulk of production work.[4] Payments on the purchase price could be accelerated if gas production exceeded a specified amount, and the leases were purchased through an intermediate corporation so that Texas Eastern's liability would be substantially limited if production from the field fell below expectations.[5]

---

[3] Nineteen wells were in the ground; respondents state that seven more were to be drilled.

[4] Texas Eastern had the right to make major production decisions such as what volume of gas to nominate for production each month and whether new wells should be drilled.

[5] The Commission found:

"(1) Only gas in particular strata is conveyed; and the producers retain their interest in oil and other minerals;

"(2) In effect the transaction is for the sale of stripped gas inasmuch as the producers are to receive a production payment from Texas Eastern from the sale of natural gas liquids;

"(3) While the payment for the leases is represented by notes and spread over a 16-year period, the notes have an acceleration clause

Completion of the transfers was conditioned upon issuance of the necessary certificates by the Commission.

The Commission granted Texas Eastern's request to reopen the proceedings in order to consider the lease-sale plan, and issued an unconditional certificate to Texas Eastern permitting it to build the pipeline facilities necessary to connect with Rayne Field. In issuing the certificate the Commission overruled objections made by the New York Public Service Commission that the prices paid for the leases were not justified, and noted that "Texas Eastern has not filed an application for a certificate authorizing the acquisition of the Rayne Field leases and we have no authority to issue such a certificate." 21 F. P. C. 860, 864.

Soon thereafter the lease-sale transactions were completed and Texas Eastern began to receive gas from Rayne Field for interstate distribution. However, on review of the Commission's action the Court of Appeals for the District of Columbia Circuit set aside the certificate order because the language and tenor of the Commission's opinion appeared to approve the prices paid for the leases under the acquisition agreement. *Public Serv. Comm'n of New York* v. *FPC*, 109 U. S. App. D. C. 289, 287 F. 2d 143. The court thought it of "no importance here that the transactions by which Texas Eastern proposes to

---

by which payment is accelerated if production is increased, so that Texas Eastern's payments would be geared to production;

"(4) By a management agreement dated July 27, 1959, Continental agrees to operate the field, including drilling wells and managing all wells and equipment, and to deliver to Texas Eastern specified minimum daily quantities of gas; Texas Eastern will reimburse Continental for its expenses in operating the field but the assignment of the leases shows that the costs of operating the leases will be defrayed out of the production payments to which Continental is entitled;

"(5) It is Louisiana Gas [the intermediary corporation], not Texas Eastern which is liable on the notes to the producers, so that the true purchaser of the gas is not bound by the principal obligation of the lease sale transaction." 29 F. P. C. 249, 254.

acquire the gas will themselves be, by virtue of a change in form, beyond the regulatory control of the Commission," *id.*, at 292, 287 F. 2d, at 146, since the Commission could regulate Texas Eastern through its certification authority over the connecting facilities regardless of its jurisdiction over the lease-sale transactions themselves. The Court therefore remanded, stating that:

> "Two courses are open to the Commission. It may, by clarification of the order presently under review, expressly disclaim any approval of the price to be paid for natural gas by the applicant. . . . Or it may reopen the record in the certificate proceeding to permit Texas Eastern to establish by adequate evidence that the acquisition costs which it proposes to incur will be consistent with the public convenience and necessity." *Ibid.*

The Commission chose to reopen the proceedings. After hearings before an examiner, it decided that the question of its jurisdiction over the lease-sales themselves, as opposed to authority over Texas Eastern's connecting facilities, was not foreclosed either by previous Commission rulings or the mandate of the Court of Appeals for the District of Columbia Circuit. On the merits, it decided that a holding that it had no jurisdiction to inquire into production costs because the transaction was cast as a sale of leases instead of a sale of natural gas "would exalt form over substance, would give greater weight to the technicalities of contract draftsmanship than to the achievement of the purposes of the Natural Gas Act, and would impair our ability to control the price received for gas sold to the pipelines in interstate commerce to the detriment of the ultimate consumer." 29 F. P. C. 249, 256.

After asserting jurisdiction over the lease-sales, the Commission concluded that it would not be in the public interest to certificate them. Reasoning that the trans-

action was not subject to effective regulation because of the difficulty of estimating the unit price paid for the gas and the impossibility of providing continuing price regulation because of the one-shot nature of the sale, it ordered that the parties be given a six-month period in which to reframe the transaction so as to rectify these alleged infirmities.

Appeal was taken, not to the Court of Appeals for the District of Columbia Circuit, but to the Fifth Circuit pursuant to the alternative routes of appeal provided by § 19 (b) of the Act.[6] That court reversed. It interpreted this Court's decision in *FPC* v. *Panhandle Eastern Pipe Line Co.,* 337 U. S. 498, as holding that leases such as those here involved "relate to the production or gathering of natural gas and are thus outside Commission jurisdiction . . . ." 336 F. 2d 320, 325. Under this view, it was unnecessary for the court to decide whether the earlier decision of the Court of Appeals for the District of Columbia Circuit had established "the law of the case" on the jurisdictional question. We granted certiorari, 379 U. S. 958, because of the importance of the issue to the proper administration of the Natural Gas Act. It should be noted that no questions are before us relating to the propriety of the Commission's disposition of the case following its assertion of jurisdiction. It is only the jurisdictional question which we must answer. We reverse.

## II.

Section 1 (b) of the Natural Gas Act provides that "[t]he provisions of this Act shall apply . . . to the sale

---

[6] 52 Stat. 831, 15 U. S. C. § 717r (b) (1964 ed.). It provides:

"Any party to a proceeding under this Act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia . . . ."

in interstate commerce of natural gas for resale . . . but shall not apply . . . to the production or gathering of natural gas." 52 Stat. 821, 15 U. S. C. § 717 (b) (1964 ed.).

Without impugning in any way the good faith and genuineness of the transactions, we think it clear that the lease-sales here in question can nonetheless be considered "sales" of natural gas in interstate commerce for purposes of the Act. A regulatory statute such as the Natural Gas Act would be hamstrung if it were tied down to technical concepts of local law.[7] The Court recognized as much in *Labor Board* v. *Hearst Publications, Inc.,* 322 U. S. 111, when it held that "employee" as used in the National Labor Relations Act was to be defined by reference "to the purpose of the Act and the facts involved in the economic relationship" (*id.,* at 129) rather than exclusively by reference to common law standards or local law. *Gray* v. *Powell,* 314 U. S. 402, decided under the Bituminous Coal Act of 1937, is also closely analogous to this phase of the cases at bar. The Act provided for establishment of minimum and maximum prices for soft coal, and specified that "the sale or delivery or offer for sale of coal at a price below such minimum or above such maximum shall constitute a violation of the code . . . ." 50 Stat. 80. A large coal consumer leased coal lands on which established mine facilities were located, and entered into management agreements with a contractor to whom the landowners had leased the mine facilities. It then claimed that the coal it had thus obtained was not subject to the Act because there had been no "sale or delivery or offer for sale"

---

[7] Respondents point to Louisiana law which does not recognize a sale of gas in place. *Frost-Johnson Lumber Co.* v. *Salling's Heirs,* 150 La. 756, 91 So. 207; La. Rev. Stat. Tit. 9, § 1105 (1962 Cum. Supp.); La. Code of Civ. Proc., Art. 3664. Other producing States, including Texas and Kansas, do recognize ownership of gas in place. 1 Williams and Meyers, Oil and Gas Law, pp. 26–47 (1962 ed., and 1963 Cum. Supp.).

by the producers, but only the sale of leases in the coal lands. The Court rejected this claim, stating that "the purpose of Congress, which was to stabilize the industry through price regulation, would be hampered by an interpretation that required a transfer of title, in the technical sense, to bring a producer's coal, consumed by another party within the ambit of the coal code." 314 U. S., at 416.

The implications of the *Hearst* and *Gray* v. *Powell* approaches for the cases at hand are manifest. The sales of leases here involved were, in most respects, equivalent to conventional sales of natural gas which unquestionably would be subject to Commission jurisdiction under *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672. Indeed, the context of this case shows that when the first plan was aborted by the *Catco* case, the parties did not alter their objectives, but merely the method of attaining them. The Court of Appeals for the District of Columbia Circuit described the lease-sale plan as a "change in form." There are differences, to be sure, between the original sale agreements and the lease-sale plan. For example, Texas Eastern has the power to make the major decisions controlling further development of the field, and we are told that the lease-sales will not trigger "favored nation" clauses in other gas contracts. But it is perfectly clear that the sales of these leases in Rayne Field, a proven and substantially developed field, accomplished the transfer of large amounts of natural gas to an interstate pipeline company for resale in other States. That is the significant and determinative economic fact. To ignore it would substantially undercut *Phillips,* and because of it the Commission (unless foreclosed, *infra,* pp. 404–406) acted properly in treating these sales of leasehold interests as sales of natural gas within the meaning of the Natural Gas Act.

We turn then to the question whether these lease-sales, even though sales of natural gas within the meaning of the Act, are nonetheless outside Commission jurisdiction because of the exemption for "production or gathering."

The statement in *Phillips* that "production and gathering, in the sense that those terms are used in § 1 (b), end[ed] before the sales by Phillips occur[red]" (347 U. S., at 678), could be read to turn the "production or gathering" exemption purely on a matter of the timing of the title transfer. That would mean, of course, that the lease-sales here involved were within the production or gathering exemption, for at the time of the transfer the gas was still in the ground. The same would be true for any sale of gas in place. Acceptance of any such narrow interpretation would make *Phillips* a shadow. Its substance lies, instead, in the judgment that "[p]rotection of consumers against exploitation at the hands of natural-gas companies was the primary aim of the Natural Gas Act," *id.*, at 685, and "congressional intent [was] to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce." *Id.*, at 682. We have not limited *Phillips* to a matter of the timing of the transaction, see *Cities Service Gas Co.* v. *State Corp. Comm'n of Kansas,* 355 U. S. 391, reversing, *per curiam,* 180 Kan. 454, 304 P. 2d 528, and consider that it would be a mistake to do so.

We conclude that even though a sale of natural gas in interstate commerce occurs before production or gathering is ended, it is nonetheless subject to regulation. In the context of such a sale, as distinguished from the situation in *FPC* v. *Panhandle Eastern Pipe Line Co.,* 337 U. S. 498, to be discussed hereafter, the "production or gathering" exemption relates to the physical activities, processes and facilities of production or gathering, but not to sales of the kind affirmatively subjected to Commission jurisdiction. This accommodation of the two relevant

clauses of § 1 (b) gives content to the national objectives of the Natural Gas Act as expounded in *Phillips,* and to the Commission's jurisdiction to accomplish them, while in no way interfering with state regulatory power over the physical processes of production or gathering in furtherance of conservation or other legitimate state concerns.

Respondents argue that the Court's decision in *FPC* v. *Panhandle Eastern Pipe Line Co., supra,* precludes this result. In *Panhandle* an interstate pipeline company transferred undeveloped leases to a production company. The Government asserted that Commission jurisdiction should attach because the gas reserves covered by the leases had been included in the interstate company's rate base computation and because the lessening of its natural gas reserves might affect the pipeline company's ability to perform adequately the obligations for which it had been certificated. This Court disagreed, holding that the disposition of undeveloped leases was encompassed by the production or gathering exemption.

Two distinctions between *Panhandle* and the present case are apparent. *First,* the *Panhandle* leases were undeveloped. The Rayne Field leaseholds were substantially developed.[8] Natural gas would and did begin to flow into the Texas Eastern system immediately upon completion of its connection with the field. The substantiality of development is a relevant consideration, for the more that must be done before the gas begins its interstate journey, the less the transaction resembles the conventional wellhead sale of natural gas in interstate commerce which, as *Phillips* held, the Act has affirmatively placed within Commission jurisdiction. *Second, Panhandle* did not involve a sale of natural gas for resale in interstate commerce, but a transfer by an interstate transmission company to a production company for sale of the gas in

---

[8] See n. 3, *supra.*

*intra*state commerce. Hence, the *Panhandle* court did not have before it the present problem—whether the transfer to an interstate pipeline company for transmission and resale in interstate commerce of proven and substantially developed gas reserves is subject to Commission jurisdiction. This was largely the problem which the Court later faced in *Phillips* and resolved in favor of jurisdiction.

The language of *Panhandle* is unquestionably broad. But flat statements such as "[o]f course leases are an essential part of production," 337 U. S., at 505, should not be taken to cover more than the particular kind of leases that were before the Court; it should not be considered as embracing each and every transfer that can be put in lease form. Concepts of *stare decisis* in statutory interpretation apply to the *holdings* with which the case-by-case method of decision surrounds a statute. To recognize no differences between the *Panhandle* transfers and those in issue here, and in the name of *stare decisis* to hold that Commission jurisdiction depends on the form rather than the substance of the transaction, would turn the case-by-case process against itself.

## III.

Because we differ with the court below on the jurisdictional issue, it is necessary for us to reach the question which the Fifth Circuit did not decide—whether the mandate of the Court of Appeals for the District of Columbia Circuit or the prior ruling of the Commission established the law of the case.

The original Commission order granting Texas Eastern a certificate to construct its connecting facilities proceeded on the basis that the Commission lacked authority to certificate the leasehold transfers. That question was not put in issue before the Court of Appeals for the District of Columbia Circuit. The opinion assumed its correct-

ness with the single statement, citing *Panhandle,* that "the Commission has been held to lack jurisdiction over gas leases," 109 U. S. App. D. C., at 291, 287 F. 2d, at 145, and concluded that "[t]he relevance of Texas Eastern's acquisition costs to these matters is unaffected by the form of the transaction; the Commission's warrant to inquire arises by virtue of its responsibility to regulate the purchaser, regardless of the status of the seller." *Id.,* at 292, 287 F. 2d, at 146. On remand, the Commission stated that in its previous decision it had "merely noted without discussion that we had no authority to issue a certificate for the acquisition of the leases . . . . It is apparent the issue was hardly considered in the earlier phase of this proceeding." 29 F. P. C. 249, 253. In exercising the warrant to inquire, the Commission became aware of the difficulties of inquiring into the reasonableness of the acquisition prices without having jurisdiction over the transfers, and as a result, reconsidered the jurisdictional question.

We do not think that either the prior Commission decision or the initial opinion on review foreclosed that possibility. It is extremely doubtful that certiorari would have been appropriate from the decision which the Court of Appeals for the District of Columbia Circuit allegedly made on the jurisdictional question, with the result that review by this Court would be precluded on this basic question of Commission jurisdiction. Furthermore, in light of the fact that this case followed two different routes of appeal,[9] thus eliminating the possibility that the initial reviewing court would clarify the extent of its mandate, compare *Colgate-Palmolive Co.* v. *FTC,* 326 F. 2d 517, it is appropriate to resolve doubts about the construction of the initial mandate in the Commission's favor.

[9] See n. 6, *supra.*

We believe that the Commission's decision to reconsider the jurisdictional issue was consistent with a decision to inquire into the acquisition costs. "On review the court may thus correct errors of law and on remand the Commission is bound to act upon the correction. . . . But an administrative determination in which is imbedded a legal question open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy committed to its charge." *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 145.

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

While I dissented in *Federal Power Comm'n* v. *Panhandle Eastern Pipe Line Co.,* 337 U. S. 498, it is not conceivable to me that the majority that made up the Court in that case would adhere to what is done today. That would be irrelevant if we dealt with a constitutional matter, as issues of that magnitude are always open for reexamination. But since we deal with the vagaries of a statute with no constitutional overtones, I think the matter should be left where *Panhandle Eastern Pipe Line* left it, saving for the Congress, of course, the power to expand the regime of the federal bureaucracy if it desires. It is sometimes customary for a court to distinguish precedents to the vanishing point, creating an illusion of certainty in the law while leaving only a shadow of an ancient landmark. That is within the judicial competence and has been done before. But where the issue has been so hotly contested as it was in *Panhandle Eastern Pipe Line* and when the Court has been so explicit in bringing traffic in gas leases under the "production or gathering of natural gas" which Congress left to the States, I would adhere to that result until Congress changes it.