EL PASO NATURAL GAS COMPANY, et al., Plaintiffs-Appellants,

v.

SUN OIL COMPANY, et al., Defendants-Appellees.

TENNECO OIL CO., et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

TENNECO OIL COMPANY, et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Nos. 77–1762, 77–2613 and 80–2404.

United States Court of Appeals, Fifth Circuit.*

July 5, 1983.

* Former Fifth Circuit case, Section 9(3) of Public Law 96–452, October 14, 1980.

Daniel Joseph, Jack W. Hanks, Daniel Watkiss, Washington, D.C., Donald C. Shepler, Salt Lake City, Utah, David K. Watkiss, Jack D. Bachman, Salt Lake City, Utah, for Northwest Pipeline Corp.

Rufus G. Thayer, Jr., Janice E. Kerr, J. Calvin Simpson, San Francisco, Cal., for People of State of Cal. and Public Utilities Com'n of State of California.

Howard V. Golub, Shirley A. Woo, Malcolm H. Furbush, San Francisco, Cal., for Pacific Gas & Elec. Co.

Charles F. Hawkins, Dallas, Tex., for Southern Union Co.

J. Alan Galbraith, Washington, D.C., Arthur R. Formanek, El Paso, Tex., for El Paso Natural Gas Co.

Steven A. Taube, Atty., George H. Williams, Jr., Jerome Nelson, Sol., Washington, D.C., for amicus curiae F.E.R.C.

Leo J. Hoffman, Herf M. Weinert, Julius L. Lybrand, Dallas, Tex., for Sun Oil Co.

George B. Mickum, III, Steven H. Brose, Washington, D.C., Edward J. Kremer, Jr., Dallas, Tex., for Atlantic Richfield Co.

Craig W. Hulvey, Washington, D.C., Robert D. Haworth, Houston, Tex., for Mobil Oil Corp.

Gordon Gooch, Charles M. Darling, IV, Washington, D.C., for Tenneco, Continental, American Petrofina, Crown Central, Delta Drilling, M/MS. Morris Mizel.

Vernon M. Turner, Houston, Tex., for Tenneco.

Michael J. Henke, Washington, D.C., Dee H. Richardson, Midland, Tex., for Union Oil Co. of Cal.

Thomas Burton, Jr., Houston, Tex., for Continental Oil Co.

W.B. Browder, Jr., Midland, Tex., for W. Watson LaForce, et al.

Donald F. Burke, Baltimore, Md., for Crown Central Petroleum.

Terry R. Barrett, Stanley L. Cunningham, Oklahoma City, Okl., for F.H.N., Ltd.

Robert D. Haworth, Houston, Tex., for Mobil Oil Corp.

Craig W. Hulvey, Washington, D.C., for Getty Oil Co.

Sherman S. Poland, Bernard A. Foster, III, Ross, Marsh & Foster, Washington, D.C., for William G. Webb, et al.

J.O. Terrell Couch, Hutcheson & Grundy, Randel R. Young, Houston, Tex., for Robert Beamon, et al.

Steven R. Hunsicker, Gordon Gooch, Charles M. Darling, IV, Baker & Botts, Washington, D.C., Strasburger & Price, Leo J. Hoffman, Dallas, Tex., for Tenneco Oil Co., et al.

Larry Pain, John L. Williford, Bartlesville, Okl., for Phillips Petroleum Co.

John S. Fick, Los Angeles, Cal., for Southern Cal. Gas Co.

William M. Lange, Colorado Springs, Colo., for Colo. Interstate Gas Co.

Robert H. Landt, Denver, Colo., for Amoco Production Co.

J. Alan Galbraith, Washington, D.C., for El Paso Natural Gas Co.

Donald K. Dankner, Washington, D.C., for CP National Corp.

Robert L. Simpson, Spokane, Wash., for Wash. Water Power Co.

G. Thomas Dohn, Yakima, Wash., for City of Ellensburg.

Justin R. Wolf, Washington, D.C., Bruce R. DeBolt, Associate Counsel, Portland, Or., for Northwest Natural Gas Co.

Thomas F. Brosnan, Washington, D.C., for Washington Natural Gas Co.

John H. Socolofsky, Asst. Atty. Gen., Salem, Or., for Public Utility Com'r of Oregon.

Kenneth O. Eikenberry, Atty. Gen., Donald D. Trotter, Asst. Atty. Gen., Olympia, Wash., for Washington Utilities and Transportation Com'n.

John T. Ketcham, Washington, D.C., for Cascade Natural Gas Corp.

P. Michael Koenig, William M. Lange, Colorado Springs, Colo., for Colo. Interstate Gas Co.

Lester D. Sitter, Denver, Colo., for Rocky Mountain Natural Gas Co., Inc.

Gary G. Sackett, Associate Gen. Counsel, Salt Lake City, Utah, for Mountain Fuel Supply Co.

Steven R. Shanahan, Sr., Asst. Atty. Gen., Cheyenne, Wyo., for Public Service Com'n of Wyoming.

Zev E. Kaplan, Deputy Atty. Gen., Carson City, Nev., for Public Service Com'n of Nev.

J. Richard Tiano, Washington, D.C., for Intermountain Gas Co.

Wm. W. Bedwell, Washington, D.C., for Southwest Gas Corporation.

Michael S. Gilmore, Deputy Atty. Gen., Boise, Idaho, for Idaho Pub. Utilities Comm.

Before BROWN, RONEY and TJOFLAT, Circuit Judges.

RONEY, Circuit Judge:

The basic question presented by these consolidated appeals is whether a series of lease-sale agreements transferring rights to certain gas-bearing lands in the San Juan Basin of New Mexico are sales of natural gas in interstate commerce within the meaning of section 1(b) of the Natural Gas Act, 15 U.S.C.A. § 717(b). Holding the agreements are not sales as defined by the Act, and are therefore beyond regulatory jurisdiction, we affirm the district court judgment to that effect and reverse the decision of the Federal Energy Regulatory Commission to the contrary.

Before considering a case of this kind, it is necessary to remind ourselves that the Commission's power to regulate the economics of natural gas transactions has been limited by Congress. Although it presumably has the power to regulate every nook and cranny of the natural gas business, Congress chose not to do so. *FPC v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498, 502, 69 S.Ct. 1251, 1254, 93 L.Ed. 1499 (1949). In this situation, it is important that the courts restrict the regulatory agencies to precisely that authority delivered to them by Congress, and to stop where Congress intended to stop no matter how tempting it might be to hearken to persuasive arguments that more regulation is appropriate. Agencies have a tendency to perceive a need for regulation. Congress is the determinative body in the matter, however, and this case has been considered and decided on that precise premise. If Congress had intended to regulate the transactions here involved, it easily could have done so with simple legislative language. We make no judgment whether it should have done so. We only decide, based upon the leading Supreme Court decision and the prior precedent of this Court, that it did not.

Before reviewing the facts and getting on with the decision, it might be helpful to describe the parties to this litigation while footnoting the names of all litigants, to state briefly the source of these appeals and the lengthy history of the litigation, and in a simplified way to suggest the issues that have been presented for decision.

*The Parties*

On one side of this litigation are two pipeline companies,[1] which acquired leasehold rights in gas-bearing lands, and the Federal Energy Regulation Commission. On the other side are numerous oil and gas concerns and a few individuals who transferred the leasehold rights in question.[2] A

1. El Paso Natural Gas Company and Northwest Pipeline Corporation.

2. Sun Oil Company, Atlantic Richfield Company, Mobil Oil Corporation, Tenneco Oil Company, Continental Oil Company, American Petrofina Company of Texas, Union Oil Company of California, Crown Central Petroleum Corporation, Delta Drilling Company, Amoco Production Company, Phillips Petroleum Company,

number of state commissions and interested private entities have been granted permission to intervene or file amicus briefs.[3]

### History of the Litigation

During the 1950s, Tenneco Oil, Sun Oil, Continental Oil, Atlantic Richfield, Phillips Petroleum, and several other oil companies entered into gas lease-sale agreements with El Paso Natural Gas Company and Pacific Northwest Pipeline Company, both gas pipeline companies. In return for their working interests in certain leases in the San Juan Basin of New Mexico and Colorado, the oil companies were to receive so-called overriding royalties or production payments. The rates established for these royalties were subject to redetermination at the expiration of the initial term. If at the expiration of the term the parties could not agree on a new rate, the rate was to be fixed by arbitration.

In 1973, Sun Oil and El Paso failed to agree on a new override rate, and the dispute was submitted to arbitration. The arbitration board awarded Sun Oil an override based on the wellhead price of *intrastate* gas which exceeded the regulated *interstate* rate. Other oil companies then sought redetermination of their rates, and El Paso thereafter brought four actions in the United States District Court for the District of Columbia seeking a declaratory judgment that the royalty recipients were selling gas in interstate commerce within the meaning of section 1(b) of the Natural Gas Act, 15 U.S.C.A. § 717(b). If in interstate commerce, the lease-sale agreements came within the jurisdiction of the Natural Gas Act, and the royalty recipients could not receive more than the interstate rates

established by the Federal Power Commission (now the Federal Energy Regulatory Commission).

The suits were consolidated and transferred to the Western District of Texas. 28 U.S.C.A. § 1406. El Paso sought reference of the case to the Commission, and the district court carried the request with the case. At the same time, El Paso filed a complaint with the Commission seeking a determination as to the status of the leases under the Act. After a protracted trial, the district court held the lease-sale agreements were not sales of gas within the meaning of the Act and dismissed the case for want of jurisdiction, implicitly denying El Paso's motion for reference to the Commission. *El Paso Natural Gas Co. v. Sun Oil Co.,* 426 F.Supp. 963 (W.D.Tex.1977). El Paso appealed, moving this Court to refer the matter to the Commission.

The Commission thereafter issued an order instituting a show cause proceeding directed to the jurisdictional issue. *El Paso Natural Gas Co.,* 58 F.P.C. 2181 (1977). Tenneco Oil, Atlantic Richfield, Sun Oil, and others sought review of the order in this Court. We denied their motions to stay the Commission's show cause proceeding but withheld decision of the appeal from the district court pending receipt of the Commission's opinion. *Tenneco Oil Co. v. FERC,* 580 F.2d 722 (5th Cir.1978).

A record was fully developed before an administrative law judge. Affirming and adopting the decision of the administrative law judge, the Commission ruled that the lease-sale agreements were within its jurisdiction. *El Paso Natural Gas Co.,* 12 F.E.R.C. ¶ 61,297 (1980). Petitions for review of

F.H.N., Ltd., Getty Oil Company, W. Watson Laforce, Jr., Morris and Flora Mizel, William G. Webb, *et al.,* Robert Beamon, individually and as trustee, Thomas L. Hail, Trustee, and Pattie Ann Beamon Lundell.

3. Washington Utilities and Transportation Commission, The People of the State of California, The Public Utilities Commission of the State of California, The Public Utility Commissioner of Oregon, City of Ellensburg, Washington, The Public Service Commission of Nevada, The Public Service Commission of Wyo-

ming, Idaho Public Utilities Commission, Pacific Gas and Electric Company, Southern California Gas Company, Southern Union Company, C.P. National Corporation, Colorado Interstate Gas Company, Cascade Natural Gas Corporation, Northwest Natural Gas Company, Rocky Mountain Natural Gas Company, Intermountain Gas Company, Southwest Gas Corporation, Mountain Fuel Supply Company, Washington Natural Gas Company, and Washington Water Power Company.

the Commission's decision were thereafter filed with this Court.

Thus the district court and the Commission, albeit on different records, reached opposite conclusions. Both decisions came before us for review. We heard extended oral argument in October 1981, permitted supplemental briefing to the end of that year and continued to receive helpful memoranda through April 1982.

## The Issues

The basic question that confronts the Court on these appeals is whether the natural gas lease-sale agreements are sales of gas within the meaning of the Natural Gas Act, 15 U.S.C.A. § 717–717w. Underlying this ultimate issue are subissues which seem to be no longer critical in light of our decision: (1) since the district court decision preceded the Commission's decision, did it have a *res judicata* effect that bound the Commission? (2) having litigated and lost in the district court, were El Paso and Northwest collaterally estopped from claiming before the Commission that the transactions are jurisdictional? (3) was the Commission bound to treat the transactions as nonjurisdictional because of its prior rulings in connection with such transfers involving some of the same parties and the same basic facts? and (4) should the district court have referred the jurisdictional issue to the Commission under the doctrine of primary jurisdiction? Other subissues argued but not decided are: (a) whether the Commission prejudged the issues, (b) whether the petitions for review in No. 77–2613 concerning the Commission's decision to conduct a show-cause proceeding on the jurisdictional issue should be dismissed for seeking review of nonfinal interlocutory orders, and (c) whether the Commission's resolution of the jurisdictional question should be given only advisory effect in the court of appeals.

## Facts

The San Juan Basin is located mainly in northwestern New Mexico, with a part extending northward into Colorado. Underlying the Basin are bowl-shaped sandstone formations permeated by large volumes of natural gas. There are three gas productive formations in the Basin: Pictured Cliffs, Mesa Verde, and Dakota. All three are characterized by low to moderate permeability and low porosity. As the district court correctly found, actual drilling is the only method of definitely locating recoverable gas saturations.

Unable to obtain all the gas reserves it desired through conventional wellhead sales, El Paso in 1951 entered into negotiations with Delhi Oil Corporation, a lease holder in the Basin. Delhi and El Paso entered into the first of the lease-sale transactions in issue in this case, GLA (Gas Lease Agreement) 47, in March 1952. In exchange for Delhi's gas reserve acreage, El Paso agreed to pay Delhi a fixed price per Mcf produced, subject to escalation over a specified period of time and thereafter subject to redetermination at the fair market value of the gas. The parties agreed to submit to arbitration any price they could not settle upon.

El Paso's program of acquiring gas reserves in the San Juan Basin, through transactions similar to GLA–47, proceeded rapidly. In all, over a six-year period, El Paso entered into 36 such lease-sale contracts with the owners of gas leaseholds in the Basin, thereby acquiring the gas underlying more than a quarter of a million acres. Thirty-five of these GLAs are in issue here. Prior to the lease-sale transactions, natural gas from some of the acreage had been sold to El Paso under conventional wellhead sales contracts.

All the GLAs followed the same general pattern: in exchange for the producer's agreement to transfer the leasehold, El Paso agreed to make overriding royalty payments for the gas when produced.

In 1952, Pacific Northwest Pipeline Corporation, a prospective interstate natural gas pipeline company, filed an application with the Commission for a certificate of convenience and necessity to build a pipeline to supply gas to the Pacific Northwest market. Since Pacific Northwest had no gas supplies, it sought commitments from

independent producers who owned substantial reserves in the San Juan Basin.

Pacific Northwest obtained commitments for San Juan Basin gas from several producers based on a lease-sale format (called "PLAs" for Pacific Lease Agreement) closely similar in most important respects to the GLAs in the El Paso transactions. The basic scheme called for Pacific Northwest to compensate the interest owner of the acreage by paying an overriding royalty, calculated as a specified sum for each Mcf of gas produced from the acreage, subject to periodic escalation. The price was also subject to later redetermination under a specified formula tied to the market, *i.e.,* the unregulated value of the gas. The PLAs conveyed rights only to gas, not oil.

Northwest Pipeline Corporation is the successor in interest, through El Paso, of Pacific Northwest.

### Jurisdictional Issue

■ Whether the gas lease-sale agreements are sales of gas within the meaning of the Natural Gas Act, 15 U.S.C.A. § 717–717w, and thus subject to the jurisdiction of the Federal Energy Regulatory Commission, is of substantial significance. If they are sales under the Act, the royalty recipients must seek certification from FERC and cannot receive payments exceeding the regulated interstate rate. If they are not sales, the recipients are entitled to the rate provided in the contracts.

The issue is difficult to decide. Neither the statute nor the cases give definitive direction. Congress intended to regulate only interstate sales of natural gas, leaving intrastate sales and the *production* of gas regulated exclusively by the states, if regulated at all. *See Interstate Natural Gas Co. v. FPC,* 331 U.S. 682, 690, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1947). An easy line to draw in legislative halls, in the real world there is much confusion between sales and production, made ever increasingly so by legal craftsmanship that sometimes makes production look like sales, or sales look like production, depending upon the interest of the client.

The main cases addressing the question focus on the geology and development of the acreage and the terms of the contracts involved. The fountainhead decision setting forth the factors to apply in determining whether a transaction is jurisdictional is *United Gas Improvement Co. v. Continental Oil Co. ("Rayne Field"),* 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965). The significant case in this Circuit is *Continental Oil Co. v. FPC ("Ship Shoal"),* 370 F.2d 57 (5th Cir.1966).

■ While ordinary wellhead sales of natural gas for resale in interstate commerce come within the jurisdiction of the Natural Gas Act, *see Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 677, 681–82, 74 S.Ct. 794, 796, 798–99, 98 L.Ed. 1035 (1954), lease transfers and the royalties collected thereunder are generally within the "production or gathering" exemption of the Act, 15 U.S.C.A. § 717(b), and thus not jurisdictional. *See Mobile Oil Corp. v. FPC,* 463 F.2d 256 (D.C.Cir.1971), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972). Difficulties arise, however, where, as in the instant case, the transactions are hybrid, manifesting characteristics of both arrangements.

■ In the leading case of *United Gas Improvement Co. v. Continental Oil Co.,* commonly known as *"Rayne Field,"* the United States Supreme Court directed a case-by-case analysis of hybrid lease-sale arrangements, the fundamental inquiry being whether "the sales of these leases in . . . a proven and substantially developed field . . . accomplished the transfer of large amounts of natural gas to an interstate pipeline company for resale in other states." 381 U.S. at 401, 85 S.Ct. at 1522. The Fifth Circuit expounded on the *Rayne Field* test in *Continental Oil Co. v. F. P. C. ("Ship Shoal"),* stating the test as follows:

(1) Is the economic effect of the transfer similar to that of a conventional sale?
(2) Is the subject of the transaction "proven and substantially developed" reserves?

(3) Is the transfer of the reserves for purpose of interstate transmission and resale?

370 F.2d at 62. *Ship Shoal* further articulated the standard for applying the second factor, whether reserves are "proven and substantially developed" within the meaning of *Rayne Field,* focusing on (1) definability of gas volume based upon proof of reserves and (2) imminent ability to produce in commercial quantities. *Id.* at 63–64.

While both the administrative law judge's decision and that of the Commission invoke *Rayne Field,* it is clear from a careful reading of the administrative law judge's opinion and the Commission's affirmance that neither correctly applied it under the law of this Circuit. In determining whether a transfer is jurisdictional under the Act, *Ship Shoal* teaches that all three of the above factors must be present. The administrative law judge and the Commission, however, elevated the first prong—economic equivalency—from a component in the *Rayne Field* test to the determinative factor on the issue. Thus, the administrative law judge stated:

> Under the *Rayne Field* case's "economic equivalent" doctrine, a lease-sale agreement would clearly be subject to regulation as a jurisdictional sale of gas at the wellhead if it is held to be economically equivalent in substance to the conventional wellhead sale which the Court held to be jurisdictional in *Phillips.*

\*   \*   \*   \*   \*   \*

The legal principles fashioned in the *Rayne Field* line of cases, when applied to the facts of this proceeding, lead inescapably to the conclusion that all of the lease-sale agreements at issue are jurisdictional. The crucial test that emerges from the cases is whether a particular transaction accomplished the transfer of large volumes of natural gas reserves to an interstate pipeline for resale in interstate commerce. If it did, the transaction is jurisdictional.

\*   \*   \*   \*   \*   \*

What is significant is the essential message of *Rayne Field*—that the transfer of large amounts of natural gas reserves to an interstate pipeline for resale in interstate commerce is a jurisdictional transaction, no matter how the lawyers decide to structure the transfer. *Rayne's* specification that "proven and substantially developed reserves" must be present is not a quantitative test, a license for future courts and Commissions to engage in massive well counting in order to ascertain whether some formulaic criterion has been satisfied. Rather, *Rayne* is concerned with commercial realities. It asks whether what was sold was gas or merely the right to explore for and develop it in the uncertain event it is found.

\*   \*   \*   \*   \*   \*

Here, too, the significant economic fact that will not go away no matter how much the respondents try to wish it away is that the GLA and PLA contracts at issue, each and every one of them, transferred large volumes of natural gas from a producer of natural gas to an interstate natural gas pipeline for transmission and sale for resale in other states. · That fact requires the finding that each of the contracts was, as a matter of law, economically equivalent to a wellhead sale of natural gas for resale in interstate commerce.

*El Paso Natural Gas Co.,* 6 F.E.R.C. ¶ 63,-037, at 65,212; 65,217–19 (1979). In affirming, the Commission held:

> We find that the magnitude of the overriding royalties and the fact that they apply to each Mcf of gas sold, irrespective of the quantities of gas the contracting parties might originally have thought were involved, lends, in our judgment, strong support to the proposition that these lease sales were virtually identical in "economic effect" to conventional sales.

*El Paso Natural Gas Co.,* 12 F.E.R.C. ¶ 61,297, at 61,683 (1980).

By focusing on "commercial realities" and the parties' assumption while negotiating that gas existed in the ground, the

administrative law judge and the Commission misread and misapplied *Rayne Field* and *Ship Shoal,* almost ignoring the requirement for a finding of jurisdiction under the Natural Gas Act that the acreage involved must be proven and substantially developed. *See Ship Shoal,* 370 F.2d at 62. Neither the Supreme Court nor our precedents have signaled a retreat from this requirement or indicated it is swallowed up by the first prong of *Ship Shoal's* test. Thus, in holding the lease-sales jurisdictional in *Rayne Field,* the Supreme Court emphasized that the land included "proven and substantially developed" gas reserves. 381 U.S. at 401, 85 S.Ct. at 1522.

Carried to its logical conclusion, the Commission's economic equivalency/commercial realities approach could render any sale of lease rights to an interstate pipeline company jurisdictional merely because the transaction ultimately results in successful production and disposition of gas in interstate commerce. Certainly, El Paso entered into the agreements in question in this litigation with the hope and expectation of obtaining gas for sale in interstate commerce. It had the same goal as a purchaser in the ordinary wellhead sale. But this statement is equally true of the lessee in a traditional transfer of a lease to gas-bearing lands. Unless all the *Rayne Field* factors, including proven and substantial development, are satisfied, such a transaction is not jurisdictional. *See Mobil Oil Corp. v. FPC,* 463 F.2d at 261–62; *see also FPC v. Panhandle Eastern Pipeline Co.,* 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949). The Supreme Court emphasized the difference in degree of development in explaining why it held the transaction jurisdictional in *Rayne Field,* but nonjurisdictional in *Panhandle. Rayne Field,* 381 U.S. at 403, 85 S.Ct. at 1523. While the Commission's downplaying of the development issue may well foreshadow the next stage in the evolution of the law, for the time being our precedents demand full application of all components of the *Rayne Field* test, including the proven and substantial development factor, as explained in *Ship Shoal.* We perceive the *Rayne Field* test to reflect the Supreme

Court's concern with the apparent congressional intent not to regulate production. A purely economic test would seem to encroach on that concern.

Focusing on the "proven and substantially developed" component of *Rayne Field* and *Ship Shoal,* the record reveals the reserves in the Basin may well have been "proven" at least within reasonable estimates. *See generally Ship Shoal,* 370 F.2d at 64–65. The district judge was correct, however, in deciding the lease-sale agreements did not involve substantially developed reserves, and the Commission erred in determining the same transfers did. Specifically, we hold the reserves underlying the leaseholds were not substantially developed at the time the lease sales were executed because of the lack of "imminent ability to produce in commercial quantities." *Ship Shoal,* 370 F.2d at 64.

An important factor in our decision is the limited extent to which the Basin had been drilled at the time the GLAs and PLAs were executed. Although different tracts varied as to development, taking the Basin as a whole, the acreage was far less drilled than the land covered by the agreements found jurisdictional in *Rayne Field.* Unlike in that case, massive efforts were required to make the fields in the Basin commercially productive. For example, GLA No. 47 covered approximately 102,400 acres. At the time of the signing of the agreement, there were fifteen wells in the Mesa Verde formation and nine in the Pictured Cliffs formation included under the GLA. State law, however, permitted far more extensive drilling: one Mesa Verde well for each 320 acres and one Pictured Cliffs well for each 160 acres. Substantial drilling took place after the agreement was reached. By December 1976, 736 wells were in the ground. An even more dramatic example of the lack of substantial development when the agreements were reached is provided by PLA–5. At the time of the agreement, there were no wells on the 188,000 acres. By December 1977, however, 365 wells were productive. Although a few GLAs and PLAs reflect substantial development, neither the

Commission nor the parties have sought to approach the issue here on an individual agreement basis.

In comparison, the acreage in *Rayne Field* featured far more development prior to execution of the agreements. In *Rayne Field,* nineteen wells were in the ground with only seven more to be drilled. 381 U.S. at 396 n. 3, 85 S.Ct. at 1520 n. 3. This significant drilling enabled the purchaser-lessee to receive gas for interstate distribution shortly after execution. *Id.* at 397, 85 S.Ct. at 1520.

The evidence in the present litigation reveals that the few wells in the ground when the agreements were executed could not have come close to depleting the acreage. For example, even after adding numerous wells in the land covered by GLA–47, the purchaser-lessee sought and received permission to double the number of wells previously allowed under state law in the Mesa Verde formation. According to the purchaser-lessee, the party favoring Commission jurisdiction and arguing the reserves were substantially developed, the additional wells were necessary to deplete the formation.

While the number of wells existing at execution of the agreement is not the *sine qua non* of substantial development, the Commission has considered this factor, and the cases point up its significance. *E.g., Rayne Field,* 381 U.S. at 396 & n. 3, 403 & n. 8, 85 S.Ct. at 1520 & n. 3, 1523 & n. 8; *Texas Gas Transmission Corp.,* Docket No. CP77–612, "Findings and Order After Statutory Hearing Issuing Certificate of Public Convenience and Necessity and Granting Petition to Intervene," at 3 (May 10, 1978). Since substantial development turns on whether the acreage is capable of imminent production of natural gas in commercial quantities, *Ship Shoal,* 370 F.2d at 64, it stands to reason that the actual number of wells in comparison to the number needed to complete production from the land is a relevant factor. As the Supreme Court stated in explaining the relevance of the substantial development criteria, "the more that must be done before the gas begins its interstate journey, the less the transaction resembles the conventional wellhead sale of natural gas in interstate commerce." *Rayne Field,* 381 U.S. at 403, 85 S.Ct. at 1523. The pipeline companies' ability to tie in a few wells shortly after consummation of the transaction does not demonstrate an "imminent ability to produce in *commercial* quantities," *Ship Shoal,* 370 F.2d at 64 (emphasis added), or *substantial* development. We therefore conclude that because the acreage was not substantially developed, the agreements in issue were not sales of gas under the Natural Gas Act.

The pipeline companies urge and the Commission ruled that even if the lease-sales were not covered by the Act at the outset, they "ripened" into jurisdictional transactions when the price paid under the contracts was redetermined through the much later 1973 arbitration. Relying on *Weymouth v. Colorado Interstate Gas Co.,* 367 F.2d 84 (5th Cir.1966), the Commission held the price redetermination proceedings constituted a reassertion of "control over the price of gas sold at a time when the gas was undeniably from a proven and substantially developed field." *El Paso Natural Gas Co.,* 12 F.E.R.C. ¶ 61,297, at 61,684 (1980).

■ We reject the Commission's approach because it is implicit in the controlling authorities that jurisdiction must be evaluated at the time lease-sale agreements are executed. In *Rayne Field,* the Supreme Court found the gas reserves proven and substantially developed at the time the lease-sales were signed. *See* 381 U.S. at 396, 85 S.Ct. at 1520. Similarly, the Fifth Circuit in *Ship Shoal* treated the pipeline company's readiness to connect to the field upon execution as a "strong indication that the field was 'substantially developed' at the *time of transfer.*" 370 F.2d at 65 (emphasis added).

*Weymouth,* relied on by the Commission, is inapposite. In that case, the parties entered into a new lease which superseded various individual leases and incorporated many substantial changes. The Fifth Circuit referred the case to the Commission for a jurisdictional determination, noting the

applicability of the Natural Gas Act to agreements reached or significantly altered after the date of its enactment. 367 F.2d at 102. In the instant case, however, redetermination of rates followed precisely according to the terms of the lease-sale agreements which remained unchanged. The mere redetermination of rates pursuant to the original contracts does not render the arrangements sales and is not factually analogous to the exercise of a retained right to withhold consent to sublease or assign, deemed jurisdictional in *Louisiana Land and Exploration Co. v. FERC,* 574 F.2d 204 (5th Cir.), *cert. denied,* 439 U.S. 1127, 99 S.Ct. 1043, 59 L.Ed.2d 88 (1979). Thus, in the absence of authority commanding a contrary rule, we hold the agreements must be evaluated for jurisdiction under the Natural Gas Act as of the date of execution.

### *Primary jurisdiction, res judicata, collateral estoppel*

The issue concerning FERC's statutory jurisdiction was pending simultaneously before both the agency and the district court. Throughout this litigation both the purchaser-lessees and the Commission have consistently maintained that under the doctrine of primary jurisdiction, the agency's expert and specialized knowledge should have been utilized from the outset and that the district court erred in failing to refer the case to the Commission for initial determination.

Whether the district court should have referred this action to the Commission under the doctrine of primary jurisdiction is, at this juncture, without consequence. Our decision in this case has been preceded by and we have considered *both* tribunals' decisions so that the spirit of the flexible doctrine, if not the letter, has been satisfied. *Cf. J.M. Huber Corp. v. Denman,* 367 F.2d 104, 111 (5th Cir.1966) (primary jurisdiction is a flexible doctrine). Beyond holding that we did not, as has been argued, refer the jurisdiction issue to the Commission in *Tenneco Oil Co. v. FERC,* 580 F.2d 722 (5th Cir.1978), this question requires no further analysis.

Similarly, we need not decide the res judicata or collateral estoppel effect, if any, of the district court opinion vis-a-vis the decision of the Commission. Our holding that the district court decision is not clearly erroneous as to the lease-sale agreements before it and that the Commission's ruling is not supported by substantial evidence obviates the need for a detailed discussion of these issues. Those parties claiming the Commission's actions were precluded by the doctrine, especially William G. Webb, et al., prevail under our approach even without their rationale. *See William G. Webb,* 49 F.P.C. 17 (1973).

NO. 77–1762: AFFIRMED.

NO. 77–2613: DISMISSED.

NO. 80–2404: REVERSED.